UNITED STATES of America,
Plaintiff-Appellee,

v.

Stanley B. ROBINSON and William
Taylor, Defendants-Appellants.

Nos. 73–1950, 73–1951.

United States Court of Appeals,
Seventh Circuit.

Argued April 27, 1974.

Decided Aug. 19, 1974.

Rehearing Denied Oct. 31, 1974.

William J. Stevens, Tyce S. Smith, Willard J. Lassers, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., Charles P. Kocoras, Gary L. Starkman, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, and FAIRCHILD and CUMMINGS, Circuit Judge.

SWYGERT, Chief Judge.

Defendants Stanley B. Robinson and William Taylor appeal their convictions on an indictment brought against them and William H. Tolliver. Robinson was found guilty by the jury on four counts. Count one charged that Robinson and Tolliver, Chicago Police Officers, conspired with Theodore Holmes, Taylor, and unknown coconspirators to deprive citizens of their rights to life, liberty, and property without due process of law, and that the operation of the conspiracy resulted in the deaths of Jeff Beard and Verdell Smith, in violation of 18 U.S.C. § 241.[1] Robinson was found guilty of the conspiracy count; Tolliver and Taylor were acquitted. In addition, Robinson was convicted under counts eight, nine, and ten of the indictment. Counts eight and nine, describing violations of 18 U.S.C. § 242, charged that he, while acting under color of law, deprived Joseph Rubio and Jeff Beard of constitutional rights and protections.[2] Robinson was charged in count ten with the kidnapping and interstate transportation of Jeff Beard in violation of 18 U.S.C. § 1201(a).[3] Robinson was sentenced to life imprisonment on each of counts one, nine and ten, and one year imprisonment on count eight, the sentences to run concurrently.

Taylor, named as an aider and abettor to Robinson in counts nine and ten, was found guilty by the jury. He was sentenced to life imprisonment on each of the counts with the sentences to run concurrently.

The foregoing charges emanate from a series of criminal activities beginning in April 1972 and culminating with the murder of Jeff Beard in May 1972. About April 21, 1972 Holmes met Robinson to discuss matters involving Robinson's employment of Holmes. During the course of the conversation Robinson told Holmes that he knew of an endeavor whereby Holmes could make a great amount of money. Robinson referred to the scheme as "milkrun," which contemplated in vague terms the robbery of an armored car containing money. Robin-

1. 18 U.S.C. § 241 provides:

If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

They shall be fined not more than $10,000 or imprisoned not more than ten years, or both; and if death results, they shall be subject to imprisonment for any term of years or for life.

2. 18 U.S.C. § 242 provides:

Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000 or imprisoned not more than one year, or both; and if death results shall be subject to imprisonment for any term of years or for life.

3. 18 U.S.C. § 1201(a) provides:

(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when:

(1) the person is willfully transported in interstate or foreign commerce;

(2) any such act against the person is done within the special maritime and territorial jurisdiction of the United States;

(3) any such act against the person is done within the special aircraft jurisdiction of the United States as defined in section 101(32) of the Federal Aviation Act of 1958, as amended (49 U.S.C. § 1301(32)); or

(4) the person is a foreign official as defined in section 1116(b) or an official guest as defined in section 1116(c)(4) of this title,

shall be punished by imprisonment for any term of years or for life.

son indicated to Holmes that four people and assorted weapons would be needed to accomplish the job. Holmes agreed to participate and told Robinson that he could get two other people to enter into the scheme. One of those was William M. O'Neal, Holmes' nephew. Holmes said O'Neal would be willing to join their efforts and that O'Neal had access to the needed weaponry due to O'Neal's membership in the Black Panthers.

O'Neal, unknown to Holmes, was a paid informant for the Federal Bureau of Investigation and had functioned in that capacity since 1968. Upon being contacted by Holmes, O'Neal was asked if he would consider becoming a part of a big robbery that was planned by a police officer. Although appearing non-committal, O'Neal agreed to meet with Holmes and Robinson to discuss the robbery plans. The meeting was arranged. At the meeting, Robinson informed O'Neal that he was planning a big robbery worth a million dollars. Robinson said that financing would be necessary in order to stage the robbery and that the necessary funds could be obtained by shaking down drug pushers. In addition, Robinson stated that these preliminary shakedown activities would bring the group closer together.

A day or two after their initial meeting, Robinson and O'Neal met at Holmes' house. Robinson said he had a possible source of financing which they should check out. The three drove to a liquor store on the south side of Chicago. Robinson went in and returned ten minutes later. He stated they were going to murder a man named Chuck McFerren because he was a witness in a state murder trial. Robinson said that money was no object and that the "hit" would be worth more than $2,000 apiece which they could use to finance the "milkrun." Robinson told his confederates their "contractor," Pancho Hall, would not pay any money until McFerren was murdered and his body disposed of.

For two weeks after obtaining their contract, Holmes, Robinson, and O'Neal staked out the El Caballero Lounge in Chicago which McFerren owned, waiting for McFerren to appear, and then following him, looking for a suitable moment to kill him. During this two week period, the conspiracy was joined by Nathaniel Junior. Robinson informed Junior that they would be shaking down drug dealers and that he would arrest them. Robinson informed Junior that the man they were presently stalking, McFerren, would only be a test to see if they would work together and, if successful, Robinson had a plan to rob an armored car containing a million dollars. Junior was informed by Robinson that if they could work together, Robinson could get them other "hit" contracts.

On May 6, 1972, O'Neal, Robinson, and a person O'Neal identified as William Tolliver were seated in Robinson's car outside of McFerren's El Caballero Lounge waiting for McFerren to leave. After waiting six hours, at approximately 5:00 a. m., McFerren's Cadillac automobile pulled away from behind the club and headed toward the Dan Ryan Expressway. Robinson followed the automobile onto the expressway. After trailing the automobile for a mile, Robinson maneuvered his car into a position that enabled the person O'Neal identified as Tolliver to fire a rifle blast through the rear window of the Cadillac. The shot killed the passenger in the automobile. The next day O'Neal called Robinson and informed him that the wrong person had been shot; that McFerren was not riding in the Cadillac and, instead, they had shot a man named Verdell Smith. Later that day, Robinson and O'Neal went to Pancho Hall to collect money on their contract. Robinson stated that Hall declined to make any kind of payment until the right person was dead.

The next event in the conspiracy began with a meeting on May 15, 1972 between Robinson, O'Neal, and Robert Bruce on the west side of Chicago. Before the meeting Robinson had informed O'Neal that he had a $5,000 murder contract on Joe Rubio, a reputed narcotics

pusher. During the meeting they spotted Rubio and proceeded immediately to follow him in O'Neal's car.

Robinson instructed O'Neal to overtake Rubio and stop the car he was in. After stopping Rubio, Robinson emerged from his car with his gun drawn. Bruce and O'Neal likewise got out with their handguns drawn. Robinson and Bruce opened Rubio's car door and forced him out whereupon Robinson handcuffed Rubio's hands behind his back and put him in the back seat of O'Neal's car. Robinson cursed Rubio, stating that he had a contract to kill him and directed O'Neal to drive to a public park forest where he said he intended to murder Rubio. Robinson informed Rubio of the $5,000 amount of the contract and indicated that it would cost Rubio money to get out of the car alive. As they proceeded to the park forest, O'Neal told Robinson that they should use Rubio to their financial advantage by having him push drugs and that it was therefore senseless to kill the man.

After reaching an apparent agreement with Rubio that he would distribute narcotics for them, the three drove Rubio back to the area in Chicago where they had abducted him. As part of the cost of getting out of the car alive Rubio paid $100 each to Robinson, O'Neal, and Bruce. After Rubio left, Robinson indicated to Bruce that there were other things they would do to make money, including the "milkrun." In addition, Robinson told Bruce that they would also have hit contracts to perform.

The last event occurred on May 17, 1972. Robinson called O'Neal and told him that he had a task to perform that evening. The two met and Robinson explained that he had a "contract" worth $1000 on Jeff Beard, a narcotics pusher. Taylor purportedly had made the contract with Robinson. Robinson and O'Neal went to the area in Chicago where Beard lived and waited for his appearance. After waiting until 10:00 p. m., with no success, they were pre-

pared to call it a night. In passing a pool hall, however, Robinson spotted Beard. Shortly thereafter, Beard left the pool hall, and Robinson accosted him. Informing Beard that he had a warrant and that he was going to take Beard to the police station, Robinson searched Beard, handcuffed him, and placed him in the back seat of the car being driven by O'Neal. Robinson ordered O'Neal to drive to the "Indiana District," to which O'Neal responded by driving south toward Indiana. On the way Robinson ordered O'Neal to stop, whereupon Robinson, after making a phone call, took control of the car and drove on to Indiana. Robinson told Beard that they wanted merely to talk to him about the possibility of Beard pushing narcotics for them. After arriving in Indiana, Robinson pulled the car off the road and asked Beard to step out so that they might discuss further matters outside of the hearing of O'Neal. Moments later, Robinson shot and clubbed Beard to death.

I

Robinson raises the following issues in this appeal: (1) whether the acquittal of Tolliver and Taylor on count one precluded the jury from finding that Robinson participated in the charged conspiracy; (2) whether the Government is chargeable with destruction of evidence with respect to the murder weapon used in the Jeff Beard killing; (3) whether it was an abuse of discretion for the district court to deny a severance to Robinson on the ground that the admissions of his codefendant Taylor regarding the latter's criminal background prejudiced Robinson; (4) whether it was an abuse of discretion for the trial judge to sequester the jury toward the end of the trial; (5) whether the trial judge committed reversible error with respect to certain evidentiary rulings; and (6) whether Robinson's due process rights were violated by the manner in which the Government conducted the investigation of this case. The defendant Taylor joins Robinson in issue number six and raises no other

matters. We affirm the convictions of Robinson and Taylor.

## II

Addressing the first issue, Robinson contends that the conspiracy conviction must be reversed. The jury found Robinson guilty on count one "with death resulting," but failed to specify as to which deaths Robinson was found culpable. It is the defendant's contention that a finding of conspiratorial conduct as far as the death of either Verdell Smith or Jeff Beard is involved must be set aside because of these circumstances: (1) because of the acquittal of Tolliver and Taylor on the first count, Robinson had no coconspirators, and (2) because of the acquittal of Tolliver, the jury must have disbelieved all of O'Neal's testimony regarding the Verdell Smith killing, including Robinson's purported involvement.

 With respect to Robinson's sole conspirator contention it is clear that · O'Neal, Taylor, and Tolliver were not members of a conspiracy resulting in the deaths of Smith and Beard. O'Neal lacked criminal intent while Taylor and Tolliver were acquitted on the count one conspiracy charge. Robinson was also charged, however, in count one of conspiracy with Holmes and other unidentified individuals. In our view there was sufficient evidence from which the jury might have properly found that Robinson, Holmes, and others were part of a conspiracy which contemplated violent acts, including murders and that the deaths of Smith and Beard did in fact result from the conspiracy. Moreover, it is not necessary that all or more than one of the conspirators participate in a particular overt act of the conspiracy. United States v. Cardi, 478 F.2d 1362, 1368 (7th Cir. 1973). Accordingly, the absence of Holmes during the occurrence of the Smith murder, and the sole participation of Robinson in the Beard killing did not preclude the jury from inferring that these were overt acts in furtherance of a conspiracy between Robinson, Holmes, and certain unknown persons.

 As to Robinson's inconsistent verdict contention, he argues that in acquitting Tolliver of the Smith murder the jury must have disbelieved O'Neal in relating the events · surrounding the murder, including Robinson's participation, and that the jury therefore returned a verdict inconsistent with its asserted factual findings. To the extent the jury's verdict can be squared with logic it may well be, as the Government contends, that the doubt surrounding O'Neal's ability to adequately identify Tolliver as the trigger man in the Smith murder impelled the jury to his acquittal. We need not engage in such speculation, United States v. Austin-Bagley Corp., 31 F.2d 229, 233 (2d Cir. 1929); for it is well established that the "conviction of some alleged conspirators does not fall because others named are acquitted, even though the conviction of the others is logically required for the finding of guilty of those held." United States v. Fox, 130 F.2d 56, 57 (3d Cir. 1942).

## III

Robinson contends that his conviction with respect to the Jeff Beard killing should be reversed because the Government allegedly permitted the destruction of evidence which it is claimed might have exonerated Robinson of the murder. The evidence destroyed was the murder weapon, a .45 caliber handgun, claimed to have been used by Robinson in shooting Beard.

The asserted destruction of evidence occurred as a result of an attempt by O'Neal's father, William O'Neal, Sr., to clean the .45. After Robinson and O'Neal drove back to Chicago from Indiana on the morning of the Beard killing, Robinson gave O'Neal the .45 used to shoot Beard. The gun was covered with mud from Robinson's struggle with Beard during the killing. O'Neal took the weapon to the home of his father in Chicago. William O'Neal, Sr. testified

that when he received the .45 it was full of mud and in a jammed condition. Although he was not asked to clean the gun, O'Neal, Sr. undertook to do so because of the dirt on it. He soaked the gun in a solution of water and table salt for twenty-four hours and then disassembled the gun and cleaned the barrel with a clothes hanger and cloth. He returned the gun to his son approximately four or five days later. The murder weapon was then turned over to an FBI agent, Ray Mitchell, on May 23, some six days after the Beard shooting.

At trial the Government's weapons analyst testified that the Beard death bullet was fired from a weapon which had the same general rifling characteristics as the .45. However, the analyst stated that in comparing the Beard death bullet with test firings from the .45, he determined that an identification between the two was impossible because of differences in the microscopic marks. The weapons analyst could not therefore make a positive determination whether the .45 was used to fire the Beard death bullet. The witness said, however, that William O'Neal, Sr.'s cleaning and treatment of the weapon could have changed the microscopic marks left by the barrel of the .45 so as to preclude their identification with marks left by the barrel on a bullet fired before its cleaning.

Robinson asserts that the Government allegedly permitted the destruction of potentially exonerating evidence and that his conviction should therefore be set aside regardless of the good faith or bad faith of the Government. It is contended that the Government had a duty to have taken immediate possession of the murder weapon and that failing to do so, it should not be allowed to "explain away" the discrepancies revealed in the weapon analysis.

Although the defendant relies heavily on United States v. Bryant, 142 U.S. App.D.C. 132, 439 F.2d 642 (1971) for support, we do not reach the issues suggested by that decision, for Robinson's trial tactics have so obscured the issue that we must hold it to have been waived. At trial, Robinson attempted to convey the impression that O'Neal stole the .45 from him. The Government argues that this was an attempt to blame O'Neal for Beard's murder, a theory which would necessarily concede that the .45 was the murder weapon and render the lost evidence irrelevant. The Government's argument does not necessarily follow from the cited transcript passages; Robinson could have consistently argued both that the .45 was not the murder weapon and that he did not possess it. However, the Government's position is given much strength by the fact that Robinson did not raise the destruction of evidence issue in the trial court. This suggests that he was willing to concede the identification of the .45 as the murder weapon.

█ More importantly, Robinson's failure to raise the issue below denied the trial judge an opportunity to pass on the factual questions involved. We have no evidence or findings as to whether O'Neal acted in bad faith in giving the gun to his father. We must speculate whether Robinson's trial theory conceded that his gun was used to kill Beard. Both of these questions would have been substantially clarified had the issue been raised below. Because he appears to have conceded the issue and at the very least presented an alternative theory which conceded the issue *arguendo,* and since he did not raise the issue below, and this has left the record so incomplete that we cannot resolve it, we rule that any error was waived.

IV

Robinson contends that it was an abuse of discretion for the trial judge to deny his motion for severance under Federal Rule of Criminal Procedure 14 in view of the alleged prejudice caused him by being tried in the same proceeding with the defendant Taylor. The basic prejudice to Robinson is claimed to emanate from evidence impeaching Taylor which Taylor admitted in his testimony. That testimony pertained to

Taylor's prior two felony convictions involving narcotics and Taylor's conceded operation of a "narcotics pad" in Chicago. Robinson urges that forcing him to trial with Taylor burdened Robinson with the credibility of a man who was easily impeached. In addition, Robinson contends that the trial judge erroneously refused a limiting instruction designed to cure the prejudice.

■ We have previously spoken to this issue in United States v. Tanner, 471 F.2d 128, 137 (7th Cir. 1972) where we stated:

A defendant bears the burden of demonstrating that he has been prejudiced by the joinder; that burden is a difficult one. "The defendant must show something more than the fact that 'a separate trial might offer him a better chance of aquittal.'"

Robinson's allegation that the testimony relating to Taylor's criminal record and narcotics activity prejudiced him is not sufficient to make out a showing of prejudice warranting severance. Indeed, Robinson's allegation is no more than a claim that a separate trial would have created a stronger probability for his acquittal. The mere assertion that the impact of impeachment evidence pertaining to Taylor may carry over to Robinson thereby prejudicing him is not enough to meet the difficult burden imposed on a party seeking to establish prejudicial joinder. Accordingly, we hold that the trial judge did not abuse his discretion in denying Robinson's motion for severance.

## V

Robinson contends that the trial judge's sequestration of the jury on the Government's motion at a point in the trial immediately preceding Robinson's testifying unfairly tainted the defendant, and that there was no substantial reason justifying sequestration. Robinson claims that under the circumstances the action of the judge was highly prejudicial and that it was an abuse of discretion for the trial court to grant the Government's motion.

The Government made its motion for sequestration after the *voir dire* examination by defense counsel of FBI Agent Roy Mitchell and Chicago Police Officer James Tobin which was conducted for the purpose of making an offer of proof. The offer of proof was denied whereupon the Government made its sequestration motion charging that defense counsel's offer of proof raised potentially prejudicial matters far adrift from what the jury might properly consider and that, in part, the offer of proof had no real purpose so far as making a record. The Government contended that in view of the attendance at trial and during the offer of proof of the news media, a potential risk existed to the proper conduct of the trial in the event the substance of the offer of proof might inadvertently or otherwise come to the jury's attention.

■■ Quite clearly sequestration is a discretionary matter for the trial judge, subject to challenge only upon a showing of abuse. Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910); Kleven v. United States, 240 F.2d 270 (8th Cir. 1957). In scrutinizing the trial judge's exercise of discretion, we must keep in mind that the "purpose of sequestering is . . . to protect the jury from interference," Sheppard v. Maxwell, 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966), and that in a trial likely to arouse substantial public interest, such as the one here, the trial judge should be alert to safeguarding the jury from any potential interference with its decision. In our view the trial judge was correct in believing that defense counsel's offer of proof was sufficiently prejudicial to warrant mid-trial sequestration in order to avoid the potential risk that the matters involved in the offer of proof might somehow come to the jury's attention.

We disagree with Robinson's assertion that the timing of the sequestration order, just prior to when he was to take the stand in his defense, somehow impugned his right to a fair trial. The trial judge carefully instructed the jury as to the purpose for sequestering them and emphasized that neither party was chargeable with the decision, but that it was solely his responsibility. Under the circumstances, therefore, the trial judge did not abuse his discretion in ordering sequestration of the jury during the trial.

## VI

Robinson challenges four evidentiary rulings: (1) the Government was permitted to introduce evidence of alleged crimes which Robinson contends were not encompassed by the indictment; (2) Robinson contends that he was improperly precluded from impeaching O'Neal by establishing a foundation, through FBI Agent Roy Mitchell, for showing that O'Neal lied when he testified that he observed Robinson in a Cadillac in mid-July, 1972; (3) Robinson claims that the court erroneously prevented him from impeaching O'Neal through hearsay testimony related by Officer Tobin; and (4) the Government allegedly improperly impeached Robinson by prior inconsistent statements contained in a book manuscript prepared by Robinson.

■ Turning to the first contention, the alleged crimes not charged in the indictment related to evidence involving a plan to rob an armored truck in Chicago, the so-called "milkrun," and evidence pertaining to other "contracts" to murder. As to the evidence involving the milkrun it would appear that the crime charged in count one of the indictment adequately contemplated the so-called milkrun.[4] With respect to the evidence of other murder contracts, the evidence which Robinson challenges was either the subject matter of various substantive counts in the indictment against him or involved areas into which the defense counsel ventured initially. Accordingly, we find Robinson's challenge regarding alleged crimes not part of the indictment to be without merit.

■ Robinson's second challenge to certain evidentiary rulings concerns the trial judge's refusal to allow Robinson to elicit testimony from Agent Mitchell to the effect that O'Neal told the agent that he saw Robinson in a 1971 Cadillac bearing Illinois license plates around July 11, 1972.[5] Since he was not allowed to put the foundation question to the witness, Robinson was foreclosed from bringing in the testimony of the owner of the Cadillac, which would have contradicted O'Neal's disclosure to Mitchell. The owner of the Cadillac would have testified that at no time in mid-July 1972, was Robinson ever present in his automobile. In excluding the foundation question and the ensuing testimony, the trial judge stated that it was immaterial whether O'Neal saw Robinson in July 1972 for it was undisputed that Robinson had disappeared at that time, almost a full month after the last act in furtherance of the conspiracy. The trial judge went on to hold that the "issue of whether Robinson was in Chicago in July, and thus whether O'Neal was mistaken or lied about seeing him then, is collateral and may lead to waste of time and distraction of the jury from the real issues in the case." We agree, and add only that the probative value of this evidence with respect to impeachment purposes was clearly outweighed by its tendency to distract the jury from the real issues at trial and its potential to

---

4. Indeed, the milkrun was an objective of the conspiracy alleged. It was an inducement whereby Robinson enlisted others to join him in his efforts to deprive various individuals of their civil rights.

5. On prior cross-examination O'Neal admitted that he had told Agent Mitchell of seeing Robinson three times in a 1971 Cadillac in early July.

unduly consume time. The evidence was properly excluded.

Addressing the defendant's third evidentiary contention, at trial Robinson sought to introduce testimony by Chicago Police Officer James Tobin to the effect that in May and June 1972 FBI Agent Roy Mitchell told Tobin that O'Neal had made certain statements to Mitchell concerning the killing of Verdell Smith. The statements allegedly made in May were: (1) that O'Neal was accompanied in the murder car by a male Negro sergeant of police and also by a male Negro patrolman who was on furlough; and (2) that the sergeant of police took the fatal shot. The statements allegedly made in June were: (3) that it was Tolliver and not Robinson who took the fatal shot; and (4) that Robinson was driving, Tolliver was seated in the right front seat, and O'Neal was positioned in the rear seat of the automobile.

O'Neal's trial testimony was that Robinson, not Tolliver, was on furlough; Robinson was the driver of the car; Tolliver took the fatal shot from the rear seat; and O'Neal was seated in the right front seat. The defendant's purported aim in attempting to utilize the Tobin testimony was to impeach O'Neal. The trial judge declined to admit Tobin's testimony either for impeachment purposes or as substantive evidence, and, in our view, he was correct.

The Tobin testimony was offered to impeach Mitchell's testimony that he, Mitchell, did not communicate to Tobin the aforementioned statements numbered (1) through (4), that is, the "Tobin version" of the May and June statements. However, prior to offering the impeaching testimony of Tobin, it was incumbent on the defendant to put the preliminary question to Mitchell thereby adducing the "primary assertion," namely, the assertion to be impeached. The defendant never asked Mitchell whether O'Neal had communicated to him the

"Tobin version" of the events surrounding the Smith killing. Had the defendant made this inquiry, Mitchell may well have responded by denying that O'Neal ever told him the "Tobin version" of the events; at that point the defendant would then have a primary assertion capable of impeachment.

Even assuming that the lack of a primary assertion is not fatal to Robinson's contention, we nevertheless hold that the Tobin testimony is inadmissible. Robinson offered the testimony to impeach the anticipated testimony of Mitchell that O'Neal never communicated to him the Tobin version of events involving the Smith murder. It is an established rule that when a witness' testimony is "merely negative" and "not damaging to the examiner, but merely disappointing," the witness may not be impeached by showing a prior inconsistent extra-judicial statement that would be favorable to the examiner. McCormick, Evidence, pp. 71–72 (2d ed. 1972); Taylor v. Baltimore & Ohio R. Co., 344 F.2d 281, 283–285 (2d Cir. 1965). The rationale for the rule is "the protection of the other party against the hearsay use by the jury of the previous statement," (McCormick, *supra*, pp. 71–72) for it is thought that whatever legitimate effect the impeaching testimony might possess, it is outweighed by the potential that the jury will use it as substantive evidence regardless of instructions by the court as to its limited purpose. Mitchell's denial that O'Neal told him the "Tobin version" of events would be merely negative in its effect on Robinson's defense and, as such, not damaging. Under the circumstances, the Tobin testimony was not admissible to impeach Mitchell. In addition, it is clear that Tobin's testimony covering prior inconsistent statements of Mitchell could not be admitted as substantive evidence that O'Neal made the statements. United States v. De Sisto, 329 F.2d 929, 933 (2d Cir. 1964); United States v. Cunningham, 446 F.2d 194, 197–198 (2d Cir. 1971).

**218**

Robinson's last challenge to an evidentiary ruling involves the use of a book manuscript authored by Robinson during the Government's cross-examination of Robinson. The manuscript dealt with the narcotics traffic in Chicago and portrayed the experiences and life of a police officer who underwent experiences similar to those described by Robinson in his testimony at trial. Robinson had given the manuscript to a Chicago newspaper reporter, David Young for the purpose of enlisting the aid of the reporter in editing the manuscript. Young testified that Robinson had told him that the manscript was an accurate representation of events as Robinson saw them. Robinson testified, however, that certain portions of the manuscript were fictionalized.

 The trial judge allowed the Government to cross-examine Robinson on the manuscript for the purpose of impeaching Robinson by showing prior inconsistent statements in the manuscript, ask Robinson whether they were true or fictionalized, and, if true, treat the statements as any other prior inconsistent statement. Robinson contends that because of the tone and nature of the manuscript, he was highly prejudiced by its reading at trial. We disagree; the prejudice to Robinson, if any, was slight. It is difficult to perceive any prejudice merely from the fact that the manuscript depicted Robinson as an honest and clever "supercop" in the fight against narcotics, while casting the authorities as stupid and venal. Moreover, the prejudicial impact, if any, was far outweighed by the probative value of the manuscript with respect to matters of impeachment. Accordingly, we find Robinson's contention to be without merit.

## VII

Robinson, joined by Taylor, contends that the manner by which the Government conducted its investigation of this case was so shocking to the conscience and violative of the underpinnings of due process that the Government should have been prevented from prosecuting them. Specifically, the defendants condemn the Government's use of an informant, O'Neal, who actively participated in the events of the conspiracy involving torture, extortion, and murder. Also, the defendants contend that the Government failed to timely intervene in the series of crimes of which it had full knowledge in advance. It is these circumstances which the defendants contend support their assertion that the Government was guilty of unlawful conduct and should thereby not be allowed to prosecute.

 We agree with the defendants that one of the primary obligations of federal law enforcement officials is the safeguarding and preservation of property and lives from criminal depredations. However, the very person who engages in those criminal depredations should not be heard to complain of a breach of the obligation to safeguard life and property. Indeed, we find it anomalous that the defendants in effect claim that they should not answer for their heinous crimes because the Government failed to timely intervene to prevent them from doing what they had always intended to do. The defendants do not argue entrapment, nor do they claim to have been induced by the Government or its informant. Their only tactic is to shift the focus of scrutiny to the actions of the Government. That is not enough, for it cannot be gainsaid that the defendants initiated and engaged in activities clearly shocking to conscience and violative of basic notions of civil and human rights. Accordingly, we hold that if there was a breach of obligation on the Government's part, only the innocent victim may legitimately complain.

The convictions of defendants Robinson and Taylor are affirmed.