UNITED STATES of America,
Plaintiff-Appellee,

v.

Florian B. RAS, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Thomas THERMOS,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Joseph C. MICALETTI,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert MULLEN, Defendant-Appellant.

Nos. 82–2021, 82–2073, 82–2085 and 82–2087.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 24, 1983.

Decided July 25, 1983.

Patrick A. Tuite, Robert A. Fisher, Frazin & Fisher, Chicago, Ill., for defendants-appellants.

Alan N. Grossman, Chicago, Ill., for plaintiff-appellee.

Before PELL and BAUER, Circuit Judges, and GRAY, Senior District Judge.[*]

BAUER, Circuit Judge.

Defendants-appellants Florian Ras, Joseph Micaletti, Robert Mullen, and Thomas Thermos bring this direct appeal from their criminal convictions in the United States District Court for the Northern District of Illinois. Our jurisdiction is based on 28 U.S.C. § 1291. The defendants allege numerous grounds for reversal; none of their arguments has merit. Therefore, we affirm the judgments of conviction.

## I. FACTS

Defendant Ras was employed as an inheritance tax examiner by the Illinois State Treasurer. In this capacity, Ras was responsible for conducting inventories of decedents' safe deposit boxes to ascertain assets subject to the state inheritance tax. Under the procedures of the Treasurer's office, each inventory was conducted on the premises where the safe deposit box was maintained. At least one witness was present at each inventory. Upon completion of each inventory, Ras prepared a list of all items found in the box. The inventory list was then signed by Ras and the witness(es); the signatories to each such list attested that all items not otherwise noted had been returned to the safe deposit box.

From April 1979 to September 1980, Ras inventoried hundreds of decedents' safe deposit boxes. Following Ras' inventories of six such boxes, stocks and bonds belonging to the decedents were negotiated. The negotiated securities had not been listed on Ras' inventories, although Ras' fingerprints appeared on three such stock certificates. All decedents' signatures on the negotiated securities, which had a total value of approximately $277,000.00, were forgeries.

Defendant Mullen, a close personal friend of Ras', received most, if not all, of the stolen stocks and bonds. Mullen, in turn, gave the securities to others for negotiation. The first set of stolen securities was negotiated by Defendant Micaletti and Charles McGowan; both were employees at Mullen's business, Kelly's Club. The remaining securities passed from Mullen to his friend Louis Thermos (Louis) for negotiation. Louis enlisted the aid of Joseph Marren, Michael Small, and Louis' cousin, Defendant Thomas Thermos, to negotiate these stocks and bonds.

On March 16, 1982, a grand jury returned an eighteen count superseding indictment charging Ras, Mullen, Marren, Small, Micaletti, McGowan, Louis Thermos, and Thomas Thermos with conspiracy and various substantive offenses.[1] Ras, Mullen, Micaletti, and Thomas Thermos pled not guilty.[2] The

[*] The Honorable William P. Gray, Senior Judge of the United States District Court for the Central District of California, is sitting by designation.

[1.] Count 1 charged all defendants with conspiracy to (1) steal securities from the custody of federally insured banks; (2) cause stolen and forged securities to be transported in interstate commerce; and (3) utter and publish forged U.S. Savings Bonds. Count 1 also charged that defendants had committed certain overt acts in furtherance of the conspiracy, including the substantive violations set forth in Counts 2–18 of the indictment. Counts 2, 4, 5, 8, 9, and 15 charged Ras with theft of securities from bank custody in violation of 18 U.S.C. § 2113(b). Counts 3, 10, and 11 charged Ras, Mullen, and Small with uttering and publishing forged United States securities in violation of 18 U.S.C. § 495. Count 14 charged Ras, Mullen, and

Marren with uttering and publishing forged United States securities. Counts 6 and 7 charged Ras, Mullen, Marren, Louis Thermos, and Thomas Thermos with causing stolen securities to be transported in interstate commerce in violation of 18 U.S.C. § 2314. Counts 12 and 13 charged Ras, Mullen, Marren, and Thomas Thermos with causing stolen securities to be transported in interstate commerce. Count 16 charged Ras, Mullen, and McGowan with causing stolen securities to be transported in interstate commerce. Count 17 charged Ras, Mullen, and Micaletti with causing stolen securities to be transported in interstate commerce. Count 18 charged Micaletti with perjuring himself before the grand jury in violation of 18 U.S.C. § 1623.

[2.] Marren, Small, and Louis Thermos entered guilty pleas; McGowan is a fugitive.

case against these four was tried to a jury, which found each defendant guilty of all counts with which he was charged.[3]

Ras was sentenced to incarceration for a period of seven years and to five years probation, these sentences to be served consecutively. He was also ordered to make restitution in the amount of $250,000. Mullen was sentenced to incarceration for thirty months and to five years probation; he also was ordered to make restitution in the amount of $250,000. Micaletti received a sentence of incarceration for one year and a probation period of five years; he was ordered to make restitution in the amount of $40,000. Thermos was sentenced to a two-year period of probation.

All post-trial motions were denied and defendants brought this appeal. The defendants allege several errors by the district court. Each allegation of error is discussed and rejected below.

## II. The Multiple Conspiracies Issue

Defendant Thermos asserts that the evidence revealed multiple conspiracies, rather than the single conspiracy charged by the indictment. He urges that this constitutes a fatal variance between indictment and proof which requires reversal of his conviction under *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Related to this issue is the contention of both Thermos and Micaletti that the district court erred by its refusal to give Thermos' proposed instructions regarding multiple conspiracies to the jury.

### A. The Evidence Established a Single Conspiracy

■ The district court properly found that the evidence in this case established a single, ongoing conspiracy. Various defendants joined the conspiracy at different times and performed different functions. Some played a greater role in the overall scheme than others. But these considera-

tions are not the benchmarks against which we judge a conspiratorial enterprise. Our concern is whether these defendants knowingly embraced a common criminal objective: the negotiation of stolen securities.

Thermos contends that his knowledge was limited to those stock certificates which he helped to negotiate. He disavows any contemporaneous knowledge of his co-conspirators' involvement in the theft and negotiation of other securities. Thus, Thermos urges that his criminal liability must be limited to those acts which he personally committed, or of which he had actual knowledge. This argument is without merit.

■ The law is well-settled that one who joins an ongoing criminal enterprise and knowingly furthers its objective is a member of that conspiracy. "There is no requirement that every defendant must participate in every transaction in order to have a single conspiracy . . . ." *United States v. Hutul,* 416 F.2d 607, 619 (7th Cir. 1969). Moreover, "[w]hile the parties to the agreement must know of each other's existence, they need not know each other's identity nor need there be direct contact." *United States v. Varelli,* 407 F.2d 735, 742 (7th Cir.1969); *accord United States v. Abraham,* 541 F.2d 1234, 1238 (7th Cir. 1976).

In this case, the evidence showed a single dynamic conspiracy. Ras removed the securities from decedents' safe deposit boxes and gave them to Mullen for negotiation. Mullen, in turn, enlisted the aid of the other defendants, who negotiated the securities. The common objective was the conversion of stolen stocks and bonds into cash.

Thermos acted in aid of this common purpose. That he may have done so without actual knowledge of every other transaction involved in the conspiracy has no legal significance. Thermos knowingly joined in an ongoing conspiracy; and,

---

**3.** Micaletti waived his right to a jury trial with respect to Count 18 of the indictment; the district court found Micaletti guilty as to that count.

During trial, the district court granted Mullen's motion for a judgment of acquittal with respect to Counts 16 and 17.

" 'when he embark[ed] upon a criminal venture of indefinite outline, he [took] his chances as to its content and membership.' " *United States v. Bastone,* 526 F.2d 971 (7th Cir.1975) (quoting *United States v. Andolschek,* 142 F.2d 503, 507 (2d Cir.1944)). Because the facts showed a single conspiracy, in which Thermos participated, we reject his argument that he is not properly subject to criminal liability for the acts of his co-conspirators.

*B. The District Court Properly Refused to Instruct the Jury on Multiple Conspiracies*

■ This case, as noted above, involved a single, ongoing conspiracy. Thus, the district court acted properly in refusing to instruct the jury with regard to multiple conspiracies. *See, e.g., United States v. Ashley,* 555 F.2d 462, 467 (5th Cir.1977); *United States v. Kirk,* 534 F.2d 1262, 1269 (8th Cir.1976). Accordingly, we reject Defendants Thermos and Micaletti's allegation that the district court erred in this regard.

### III. THE MOTIONS FOR SEVERANCE

Defendants Ras, Micaletti, and Thermos claim that the district court abused its discretion when it denied their respective motions for severance. We disagree.

■ The joinder of these defendants in a single indictment was proper under Rule 8(b), Federal Rules of Criminal Procedure, because they were "alleged to have participated in the ... same series of acts or transactions constituting an offense or offenses." FED.R.CRIM.P. 8(b); *see United States v. Garza,* 664 F.2d 135, 142 (7th Cir. 1981), *cert. denied,* 455 U.S. 993, 102 S.Ct. 1620, 71 L.Ed.2d 854 (1982). All counts of the indictment dealt with acts committed by the defendants in furtherance of a single, ongoing conspiracy. The charge of conspiracy in Count 1 served to link the substantive counts against the various defendants; this satisfied the relatedness requirement of Rule 8(b) and justified joinder. *Id.*

■ Having been properly joined in a single indictment, each defendant was entitled to a separate trial only if he could demonstrate that the joinder was prejudicial to him. The burden to demonstrate prejudice is on the defendant, and that burden requires the defendant to show "more than the fact that 'a separate trial might offer him a better chance of acquittal.' " *United States v. Tanner,* 471 F.2d 128, 137 (7th Cir.1972); *accord United States v. Robinson,* 503 F.2d 208, 215 (7th Cir.1974), *cert. denied,* 420 U.S. 949, 95 S.Ct. 1333, 43 L.Ed.2d 427 (1975).

■ A motion for severance under Rule 14 is committed to the sound discretion of the trial court; thus, we will not overturn a denial of that motion absent a clear abuse of discretion. *United States v. Hedman,* 630 F.2d 1184, 1200 (7th Cir.1980), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981). Moreover, this circuit has expressed "a strong policy in favor of joint trials 'where the charge against all the defendants may be proved by the same evidence and results from the same series of acts.' " *United States v. McPartlin,* 595 F.2d 1321, 1333 (7th Cir.1979) (quoting *United States v. Cohen,* 124 F.2d 164, 165 (2d Cir.), *cert. denied,* 315 U.S. 811, 62 S.Ct. 796, 86 L.Ed. 1210 (1942)).

■ In this case the only prejudice asserted by the defendants is that which allegedly resulted from the introduction of evidence concerning co-conspirators' acts in furtherance of the conspiracy. These mere assertions are not sufficient to satisfy the requirements of Rule 14. Moreover, the evidence of co-conspirators' acts in furtherance of the conspiracy would have been admissible even in separate trials. *United States v. Cole,* 365 F.2d 57, 61 (7th Cir.1966), *cert. denied,* 385 U.S. 1024, 87 S.Ct. 741, 17 L.Ed.2d 672 (1967).

We hold that the district court properly denied the motions for severance made by Ras, Micaletti, and Thermos. Accordingly, we reject their argument that the denial of these motions constituted a clear abuse of judicial discretion.

## IV. THE SUFFICIENCY OF THE EVIDENCE

Defendants Ras and Thermos contend that the evidence was insufficient to support the verdicts against them. Thus, they argue, the district court erred in denying their respective motions for judgments of acquittal. A review of the evidence in the light most favorable to the government, *see Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), however, indicates there was ample support for the jury verdicts.

### A. The Evidence Against Thermos

Thermos contends the evidence against him was insufficient in two respects. First, he argues the evidence failed to show he knew the stock he aided in negotiating was stolen. Second, Thermos claims the evidence was insufficient to show he was a member of the conspiracy.

We examine the evidence against Thermos in the context of his role in the overall criminal enterprise. Ras removed securities from the safe deposit boxes of six decedents. From four of the boxes Ras stole United States Treasury Notes and Savings Bonds; these were negotiated through banks. Two of the thefts, however, were of stock certificates. Ras gave the stock certificates to Mullen for negotiation, who, in turn, gave the stocks to Louis Thermos.

When Louis Thermos received the first set of stock certificates, the "Berlinski stock", he discovered they could not be negotiated in the same manner as he had negotiated the bonds and treasury notes. At that point, Louis called his cousin, Thomas Thermos, who was employed as a clerk on the Midwest Stock Exchange; Thomas Thermos arranged to sell the stock through a stockbroker friend, Frank Bramson. Thomas Thermos subsequently arranged the sale of the stolen "Krasa stock" through another broker, Thomas Marlas.

Thermos now contends that the evidence was insufficient to show his knowledge that the Berlinski and Krasa stock was stolen at the time he aided in its negotiation.

With respect to the Berlinski stock, three points of evidence demonstrate Thermos' knowledge that he was engaged in unlawful activity. First, Thermos never identified his cousin Louis to the stockbroker, Frank Bramson. Accordingly, Bramson believed he was dealing with the record owner of the stock, Abraham Berlinski. Thus, Thermos knowingly allowed Bramson to treat the transaction routinely, rather than following the procedure for a third party transaction.

Second, the jury could reasonably infer that Thermos knew the address Louis supplied to Bramson was false. This inference is bolstered by the evidence that Thermos arranged to pick up the check for the stock proceeds rather than allowing Bramson to mail the check to Louis at the "bad" address.

Third, when Bramson later contacted Thermos to tell him there was a problem with the stock Thermos first avoided giving Bramson any information about Louis. Later, when Thermos contacted Bramson with Louis' true address, Thermos asked whether any problem could be alleviated by full restitution.

With respect to the Krasa stock, the evidence was more than adequate to support the inference that Thermos knew he was involved in illegal activity. First, Thermos received $7,500 from his cousin for aiding in the sale transaction. Second, although Thermos told stockbroker Marlas that "Krasa" was a friend of two traders on the Midwest Stock Exchange, this was denied by the traders at trial. Third, Thermos' story about what transpired in Marlas' office differed from Marlas' recollection with respect to how the sale was to be handled. Fourth, when Marlas informed Thermos that the real Krasa was dead, Thermos urged Marlas not to involve Thermos in any investigation as to who had posed as Krasa. This evidence, considered in conjunction with Thermos' incredible story that he arranged the stock sale on behalf of a total stranger he believed to be Krasa, provided a sufficient basis for the jury's conclusion that Thermos knew the stock was stolen.

Finally, we summarily reject Thermos' contention that the evidence was insufficient to show he was a member of the overall conspiracy. Thermos arranged for the sales of stolen stock certificates on two separate occasions. This criminal activity clearly was in furtherance of the common purpose of the conspiracy. Accordingly, Thermos was a member of that conspiracy and was criminally responsible for all overt acts committed in furtherance of the conspiracy. *See e.g., United States v. Bastone,* 526 F.2d 971 (7th Cir.1975).

### B. The Evidence Against Ras

 Ras urges that the evidence was insufficient to show he stole the securities from decedents' safe deposit boxes he inventoried. We cannot agree.

The evidence established that Ras conducted the inventories of the safe deposit boxes of the six decedents in whose names the stolen securities were issued. Although at least one witness was present at each inventory, the evidence showed that witnesses were distracted or unable to watch Ras closely. Ras carried a briefcase on each occasion, and the evidence established that in each instance he could have removed papers from the box being inventoried and placed them in the briefcase without detection.

Although representatives of the six decedents' estates searched other locations for securities of the decedents, none were found. This fairly implied that each decedent had kept all of his or her securities in the safe deposit box. Moreover, Ras' fingerprints were found on three of the Krasa stock certificates, although these certificates were not mentioned in Ras' inventory of Krasa's safe deposit box.

Additional evidence established that Mullen, who gave the securities to others for negotiation, was a close friend of Ras'. Moreover, Ras' theft of the securities comports completely with the explanation Mullen gave to Louis Thermos as to where the securities had come from.

This evidence, when viewed in the light most favorable to the government, amply supports the jury's conclusion that Ras stole the securities. Indeed, we are hard-pressed to imagine how any jury could have been expected to conclude otherwise.

### V. ADMISSIBILITY OF EVIDENCE AGAINST MULLEN

Defendant Mullen contends that the testimony of Louis Thermos was not admissible against Mullen on hearsay grounds. Mullen bases this contention on his erroneous belief that Louis' testimony could not be properly admitted as a statement of a co-conspirator because there was insufficient independent evidence to establish that Mullen and Louis were, in fact, co-conspirators. We find Mullen's argument to be without merit.

 Louis testified in great detail about his dealings with Mullen in the furtherance of the conspiracy. Louis related that Mullen had given him stolen securities on five separate occasions, and that Louis had returned the proceeds to Mullen after negotiating those securities. This testimony concerning Mullen's role in the conspiracy was not hearsay, and provided an ample independent basis for admission of any co-conspirator's statements under the guidelines of *United States v. Santiago,* 582 F.2d 1128 (7th Cir.1978).

Moreover, Mullen has neither alleged how the admission of any particular co-conspirator's statement was prejudicial to him, nor pointed to any objection to the admission of such statements at trial. Accordingly, we reject Mullen's claim that the district court erred in admitting certain evidence against him.

### VI. FEDERAL RULE OF EVIDENCE 609(a)

Defendant Ras claims that the district court abused its discretion by ruling, on Ras' motion *in limine,* that Ras' three prior felony convictions would be admissible for impeachment purposes if Ras chose to testify. We reject this claim.

Federal Rule of Evidence 609(a) allows impeachment of a witness by evidence of criminal conviction. Each of Ras' prior con-

victions was for a crime punishable by imprisonment for more than one year;[4] thus, the convictions were admissible for impeachment if the trial court, in the proper exercise of its discretion, determined that the probative value of admitting this evidence would outweigh its prejudicial effect to the defendant.

In this case the district court properly found that Ras' parole date of August, 1972, satisfied the ten-year rule of Federal Rule of Evidence 609(b). Moreover, the district court made explicit findings that the probative value of admitting Ras' prior convictions for impeachment would outweigh any prejudicial effect. These findings complied with the requirements of *United States v. Mahone*, 537 F.2d 922 (7th Cir.), *cert. denied*, 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 627 (1976).

We can find no fault with the district court's findings or ruling in this regard. Accordingly, Ras' assertion that the district court abused its discretion must fail.

### VII. Admissibility Of McGowan's Statements

Ras contends that the district court erred in admitting testimony by John Kickels and Raymond Didler. Kickels and Didler each testified that Charles McGowan had told him that McGowan worked at Kelly's Club—the club owned by Robert Mullen. Kickels and Didler each testified as well, however, to an independent basis for believing that McGowan worked at Kelly's Club; Kickels had telephoned McGowan at the club, and Didler had seen McGowan tending bar at Kelly's. Thus, the only evidence that could potentially be classified as hearsay was Kickel's testimony that McGowan had told him Mullen was the owner of Kelly's Club.[5]

The ownership of Kelly's Club, however, was established by the independent testimony of Louis Thermos, Joseph Micaletti, and Robert Mullen. In light of this independent evidence, we cannot see how Kickel's testimony in this regard could possibly have prejudiced Defendant Ras. Accordingly, we reject Ras' claim that the admission of this testimony constituted reversible error.

### VIII. The Sufficiency Of Count 18 Of The Indictment

The final claim on this appeal is Defendant Micaletti's contention that Count 18 of the indictment was fatally defective and that his conviction thereunder must be reversed. The defect alleged by Micaletti is that Count 18 failed to set forth any specific allegation of falsehood sufficient to plead a case of perjury under 18 U.S.C. § 1623.

The law, however, does not require that a perjury indictment set forth the exact words of the perjured testimony. *United States v. Rook*, 424 F.2d 403, 405 (7th Cir.), *cert. denied*, 398 U.S. 966, 90 S.Ct. 2180, 26 L.Ed.2d 550 (1970); *see also United States v. Nickels*, 502 F.2d 1173 (7th Cir. 1974). The indictment need only set out such testimony in substance.

Count 18 of the indictment in this case charged that Micaletti had testified falsely when he told the grand jury, in substance, that he had received certain Treasury Notes from his uncle and negotiated them believing them to belong to his uncle. The indictment further charged that Micaletti gave this testimony knowing both that the Treasury Notes had not been received from his uncle and that they were stolen when he negotiated them.

---

4. In 1969, Ras was convicted in Massachusetts on one charge of armed bank robbery and on one charge of unarmed bank robbery. For these crimes, Ras received concurrent prison sentences of not less than nine or more than twelve years. In 1970, Ras was convicted in federal court on a third bank robbery charge; the sentence for that crime was seven years imprisonment to run concurrently with the ear-

lier sentences. Ras was released on parole in August of 1972.

5. Because sufficient independent evidence established that McGowan was a member of the conspiracy, many of his allegedly hearsay statements were admissible as statements of a co-conspirator in furtherance of the conspiracy.

This indictment was sufficient to describe the substance of Micaletti's perjured testimony and, thus, to fairly inform Micaletti of the charge against him. Accordingly, we reject Micaletti's claim that the indictment was fatally defective.

## IX.

We have examined each argument advanced by Defendants Ras, Mullen, Micaletti, and Thermos. None of these arguments has merit. Accordingly, we affirm the judgments of conviction as to all defendants.

AFFIRMED.