Elmer Eugene FRANKLIN, Petitioner,

v.

UNITED STATES of America, Respondent.

No. 75–325–C.

United States District Court, E. D. Oklahoma.

Feb. 4, 1977.

Albert R. Matthews, Muskogee, Okl., for petitioner.

Robert D. McDonald, Asst. U. S. Atty., Muskogee, Okl., for respondent.

## ORDER

MORRIS, Chief Judge.

Petitioner, Elmer Eugene Franklin, is incarcerated in the federal penitentiary at Leavenworth, Kansas, having been found

guilty by a jury of the crime of bank robbery and having been sentenced on June 4, 1973, to a 15 year term of imprisonment. He has filed a motion pursuant to 28 U.S.C. § 2255 requesting the judgment and conviction in criminal case No. 27826 be vacated and set aside and that he be released from prison. In the alternative, he urges, for the reasons hereinafter discussed, that he be granted a new trial. He also urges alternatively that the Honorable Edwin Langley took into account at the time of sentencing two felony convictions which have since been reversed and he argues that resentencing is mandated under *U. S. v. Tucker,* 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972).

The essence of petitioner's complaint as amended is that there is "newly discovered" evidence in the form of a confession, which evidence clearly demonstrates that petitioner did not commit the crime of bank robbery of which he was convicted. He also argues that the bank records clearly show that his wife did not, on December 9, 1968, pay off a mortgage of one Francis Allen at the First State Bank in Valiant, which was the testimony at his original trial. The court has conducted an evidentiary hearing. All points raised by petitioner in the pleadings except those mentioned above were either expressly abandoned at the time the hearing was conducted or have been abandoned by virtue of not having been urged in petitioner's brief filed subsequent to the evidentiary hearing.

The main thrust of petitioner's argument is that he did not commit or participate in the robbery of the Bank of Hartshorne at Hartshorne, Oklahoma; that he was not sufficiently identified at his trial by the teller in the bank, Mrs. Walden, as being the bank robber and that indeed he could not have committed the robbery because the real robber was Mr. Charles Parrott, a well-known bank robber.

Charles Parrott was the star witness at the evidentiary hearing and told a tale which fascinated every listener in the courtroom. His testimony was as follows: He was, in effect, a professional bank robber. He had robbed 23 banks during his career but he was out on parole after having served time in the Leavenworth Penitentiary for bank burglary. At the time of the hearing he was working as a carpenter and stated he did not intend to rob any more banks. This, he intimated, was the reason he was willing to testify so freely and openly about his past activities.

Concerning the Hartshorne Bank he testified that he and his wife and petitioner and his wife were deer hunting in the Hartshorne, Oklahoma, area on Thanksgiving day and the day after Thanksgiving. On Friday afternoon after Thanksgiving he robbed the bank and he robbed it alone. He left petitioner and his wife in the woods, picked up a Grand Prix white Pontiac which he had earlier stashed in the woods near an abandoned house filled with hay and went to Hartshorne to rob the bank. He said he had been planning the Hartshorne job for about a year and that he always planned two or three bank jobs ahead.

He knew exactly where he wanted to park his car in relation to the Hartshorne bank but when he arrived there a red pickup truck was in his parking place. He drove around town waiting for it to move. After it moved he pulled into the parking place. He entered the bank, so he said, wearing a dark suit, a dark topcoat, a long stocking cap rolled up around his head, which he rolled down as he entered the bank. He said he had a sawed-off shotgun with mule ear hammers which he stuck down in his pants. The gun was not cocked. Upon entering he said he called out in a loud voice, "This is a bank robbery." One customer, he said, apparently did not take him seriously and sort of smiled and tried to kick at him. He hit the customer in the back of the neck and head with the sawed-off shotgun. He threw two pillow cases on the floor and shouted, "Get the money out of the vault." Bank employees got the money, put it in the pillow cases, and he left. More than $42,000 were taken.

In describing the procedures which he employed in robbing banks he said, "The first thing you do is dig a hole." He said it

is no trick to rob a bank. The trick is to make a successful getaway. He said a bank robber should wear dark clothes, that the robber must get to the hole which he has dug, place the money, the gun and the outside clothing which was visible to the bank employees during the robbery in the hole within ten minutes after the robbery. While driving to the hole, he said you take off your dark outer garments and underneath you should wear a light colored shirt and pants. You should then get into a pair of western boots and out of the dark shoes worn during the robbery.

On this particular occasion, after the robbery, he dropped off the white Pontiac in the woods and his wife picked him up in a pickup after he had waited a few minutes. He put the money on the floor of the pickup, they drove to the "hole," put the money and clothing in the hole, placed a rock on top, and joined petitioner and his wife, who were in the woods in the deer hunting area where he had left them earlier. He picked petitioner and his wife up within 15 minutes from the time he robbed the bank. They then went to Broken Bow and he went home shortly thereafter.

Attached to petitioner's amended motion was a copy of a letter written by Parrott to me, in which Parrott also confessed to the Hartshorne robbery. In that letter Parrott said that when petitioner was sent to the Leavenworth penitentiary after his conviction he was placed in a cell close to Parrott and they discussed the matter. Parrott stated in that letter that petitioner "was well aware I robbed the bank" when petitioner entered the Leavenworth penitentiary. Parrott also testified that on the morning after the bank robbery petitioner came by his (Parrott's) house in Broken Bow. He had a morning newspaper which carried a full account of the bank robbery and they read about it together. He said petitioner knew he had robbed the bank. Indeed Parrott testified:

I still didn't say nothing, but he knew.
Q. You didn't tell him, he just knew?
A. He knew. I didn't have to tell him.

Parrott also testified that "when Sonny Franklin come to prison I went to Sonny and I asked him, I said, Sonny, you know and I know. What do you want me to do? He says, well, I got my case on appeal. He said, I believe I will get some relief from it. I believe the Circuit Court will reverse it."

Petitioner also testified at the evidentiary hearing concerning his knowledge of Parrott's activities as follows:

Q. Did you know Charles Parrott was going to rob a bank that day?
A. No, sir.
Q. You knew he had been robbing banks, didn't you? That was his reputation.
A. I always had a pretty good idea he did.

Petitioner further testified that on the day after the robbery he went downtown to get the mail, at which time he bought a newspaper. He saw that the bank had been robbed. He and his daughter had stopped in at the restaurant that morning, where he had a cup of coffee and she had a glass of milk. After reading about the bank robbery in the newspaper he testified that he took his daughter home, and then his testimony went as follows:

Q. Then what did you do?
A. Well, I got in my pickup and went back home and left my daughter there and then I went over to Broken Bow where Charlie was living and I went to his house and I seen him and I showed him this newspaper. I didn't ask him nothing. He just looked at it and kind of smiled. I never was wanting to ask questions being nosey.

Parrott did not testify at petitioner's bank robbery trial and the matters set forth in his letter to me and the matters set forth in his testimony at the evidentiary hearing were not before that jury. The evidence before the jury at the time petitioner was convicted included testimony by one of the tellers in which she identified petitioner as the robber, saying that the brown sock cap on his head was not pulled down over his face when he entered, that she had a full view of his face, and that she viewed him

for "three or four minutes." (Tr. 67). Although she was not totally categoric in her identification she also testified, "I think this was the man." (Tr. 77). She was also asked:

Q. Well, is there any question in your mind about being able to identify today the person who robbed the bank at Hartshorne on November 29, 1968?

A. Of course, there has to be some question about it, but as near to the best of my ability the man looked like the same one that came in November, 1968, and robbed it.

The Court: What do you mean, there has to be some question about it?

The Witness: There could always be a lot of people that look alike, I suppose.

In addition, there was testimony at petitioner's bank robbery trial that petitioner's wife on December 9, 1968, went into the First State Bank at Valiant, Oklahoma; that she went to a teller's window and "paid off a note through my window. The note was in the name of Francis Allen and she gave me three ten dollar bills." (Tr. 94). It was later proved that two of the ten dollar bills which she gave the teller were bait money which was taken from the Hartshorne Bank. (Tr. 87, 88 and 96).

It is significant to note that at the time Parrott wrote the letter to me in which he confessed and when he testified at the evidentiary hearing, at which time he confessed in greater detail, that the statute of limitations on the bank robbery had run (18 U.S.C. § 3282). Indeed, Parrott was asked about this on cross-examination, at which time he indicated that he had also confessed to a bank robbery in Arkansas as well as the one in Hartshorne. The colloquy was as follows:

Q. And the fact that the Statute of Limitations has run out on this bank robbery doesn't have anything to do with the fact that you just now come back and tell about it?

A. I'll say this, the letter I wrote to Arkansas, the Statute hasn't run out.

Q. But this one has?

A. *I hope so.*

Petitioner strongly argues that in view of the confession by Parrott he should at least be given a new trial. He testified that he did not take the witness stand at his bank robbery trial because of two prior felony convictions but these have now been reversed and he would now take the stand in his own defense if this court would grant him a new trial. In his pleadings, of course, he also requests this court to vacate and set aside the judgment and to release him.

The law of this Circuit is clear that in a "newly discovered evidence" case the trial court should hold an evidentiary hearing and this the court has done. In the recent case of *Steel v. U. S.,* case No. 75–1597 (10th Cir. 1976) (unpublished) the Tenth Circuit has stated:

Newly discovered evidence, in order to establish a basis for granting a § 2255 motion, must meet the following criteria: it must not have been discoverable with reasonable diligence prior to trial; it must be more than impeaching or cumulative; it must be material to the issues involved; and it must be such as would probably produce an acquittal. *United States v. Leyba,* 504 F.2d 441 (10th Cir. 1974), cert. denied 420 U.S. 934 [95 S.Ct. 1139, 43 L.Ed.2d 408]. Additionally, newly discovered evidence must be credible. *United States v. Steel, supra.* We think the "newly discovered evidence" presented by Steel in his § 2255 motion satisfies the first four listed criteria. Only its credibility remains to be tested.

Thus, five criteria must be satisfied in order for petitioner to prevail. The first is that newly discovered evidence *must not have been discoverable with reasonable diligence prior to trial.* What "reasonable diligence" did petitioner exercise in bringing this newly discovered evidence before the court in his defense at the time of the trial? Even if it is assumed that Parrott's testimony is true, the record shows that petitioner exercised no diligence even in the face of testimony which shows at the very least that he was highly suspicious that Parrott commit-

ted the robbery. Petitioner and his wife, together with Parrott and his wife, had been deer hunting for two days prior to the robbery. They were camping together. Testimony adduced at the evidentiary hearing, both by petitioner and by Parrott, show that Parrott was gone on the afternoon of the bank robbery and that his wife was gone and picked Parrott up after the robbery. Petitioner admits that when he read about the robbery in the newspaper the next morning he immediately took his little girl home, got in his pickup and drove over to Broken Bow where Parrott lived to show him the newspaper account. He knew Parrott had a reputation as a bank robber and indeed Parrot's testimony is that petitioner *knew at the time* that Parrott had committed the bank robbery.

There is no testimony in this record that petitioner brought this information to the attention of his lawyer, that he told the FBI, or used any diligence whatsoever in bringing to the attention of the authorities that it was Parrott and not petitioner who committed the bank robbery. Now it very well may be that the reason petitioner did not want to point the finger at Parrott was because they had been lifelong friends since petitioner was two or three years old. But friends or not friends, it was petitioner and not Parrott who was being tried by a jury for the bank job at Hartshorne. And if petitioner thought, as the record clearly indicates he did, that Parrott was the culprit, then he should have exercised some diligence in his own defense in bringing that fact to light. But the record is devoid of any diligence exercised by him. Thus the first requirement of the test laid down by the Tenth Circuit is not met.

Parrott's testimony is more than impeaching or cumulative and it is certainly material to the issues involved and thus requirements 2 and 3 are met. The fourth requirement is that such newly discovered evidence "would probably produce an acquittal." If Charles Parrott had been subpoenaed and had testified at the 1973 trial of petitioner in the fashion in which he testified in this court, at a time when the statute of limitations had not run on the crime, such testimony at that time probably would have produced an acquittal. Moreover, under those circumstances the eye witness identification by the teller might have been substantially less positive than it was. That is to say, if she had been called upon in the courtroom to look at both Parrott and Franklin and make an identification concerning which one was the robber, she probably would have been equivocal. And thus the court finds that the fourth requirement has been met.

■ We now turn to the fifth and last requirement. Was the testimony of Charles Parrott credible? I will candidly admit that the tale of Charles Parrott concerning his exploits and the methods he employed while robbing 23 banks is so bizarre, so well told, and so unheard of as to make it fascinating. Parrott candidly considered himself to have been a professional bank robber. And it well may be that he robbed 23 banks during his career using the same MO, which, according to his testimony, was successful. But my mind is haunted by the question: Why did he wait until after the statute of limitations had run before confessing to having robbed the bank that his lifelong friend, Sonny Franklin, was convicted of having robbed? The question is self-answering.

It should also be noted that although Parrott was not in the courtroom during petitioner's bank robbery trial he knew everything which had transpired because while he and petitioner were in Leavenworth together he had read petitioner's transcript. He even expressed the view that he thought petitioner's conviction would be reversed on appeal. I have no doubt but that Parrott was a professional bank robber but I am unable to conclude on the basis of the evidence adduced that he robbed the Hartshorne Bank and I find that he did not. *Clark v. U. S.,* 370 F.Supp. 92 (W.D.Pa.1974).

Petitioner also argues that the testimony of Delbert Maness at his bank robbery trial was false in that the bank records clearly show, contrary to Maness' testimony, that the Francis Allen note was not *paid off* by

petitioner's wife on December 9, 1968, when she gave Maness three ten dollar bills, two of which were bait bills. Petitioner argues that although Maness testified that the note was paid off, the bank records show that in fact the note was not paid off; that only $25.00 was paid on the note; that there remained a balance of $47.50, which balance was not paid until December 17, 1968.

The important fact is not whether the bank note was paid off. The question is did petitioner's wife give Maness three ten dollar bills, including two bait bills, and about that there is no dispute. She did.

■ Petitioner also argues that this court should resentence Franklin because Judge Langley at the time of sentencing took into consideration two prior felony convictions which have since been reversed. He relies upon *U. S. v. Tucker,* 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972). In that case it is clear that the trial judge, in arriving at what he considered to be the appropriate sentence, "gave specific consideration to the respondent's previous convictions before imposing sentence upon him." 404 U.S. at 447, 92 S.Ct. at 592. In view of the fact that two of those convictions were wholly unconstitutional, the court determined that the sentence imposed was "founded, at least in part, upon misinformation of constitutional magnitude."

Petitioner has adduced evidence that two prior felony convictions of his were set aside and that they were relied upon by Judge Langley in arriving at a sentence. The court finds that petitioner has proved that two prior felony convictions were set aside, one by the Supreme Court of Arkansas and one by the United States District Court for the Western District of Arkansas. He has not demonstrated, however, that either of these felony convictions were relied upon by Judge Langley in arriving at the proper sentence. Indeed, petitioner's Exhibit 2 shows that the Arkansas decision setting aside petitioner's conviction for burglary of a bank was set aside on October 25, 1971. This was some 19 months before petitioner was sentenced before Judge Langley on June 4, 1973. The transcript of the hearing before Judge Langley at the time of sentencing makes *no reference whatsoever,* so far as can be determined, to this conviction or the setting aside of this conviction which occurred well in advance of the day of sentencing. Neither does the transcript make any reference to petitioner's conviction for burglary in the Circuit Court of Ouachita County, Arkansas, set aside by the United States District Court for the Western District of Arkansas on October 1, 1974. Indeed it was petitioner's counsel, Mr. Robinson, and not Judge Langley, who made mention of the fact that petitioner "got involved in some difficulty in Arkansas." Judge Langley did indicate following counsel's plea at the time of sentencing that he was aware that petitioner had a record, but stated in that regard, "He does not have any convictions for major offenses like this, but he has all sorts of disturbances and assault charges, aggravated assaults." Moreover, the sentencing record makes it crystal clear why Judge Langley arrived at the sentence which he did. He thought he was guilty. At that time he stated:

> Well, Mr. Robinson, you must know that I think Mr. Franklin is guilty. I don't know whether he is the one who entered the bank or not. But, you know that I know that the money was found in his house, or a substantial part of it. It was not admitted in evidence against him because of the, actually, unforgiveable dereliction of the FBI in neglecting to get a search warrant. But, I know about it, because I suppressed the evidence. I thought Mr. Franklin was guilty. No question in my mind about it. As a matter of fact, I think it is immaterial whether he is the one who entered the bank or not. (Tr. 199–200.)

This court accordingly finds and concludes that the basis for imposition of sentence in this case was not based in whole or in part upon either of petitioner's convictions which were later reversed. On the contrary, the sentence was based upon Judge Langley's considered judgment after having heard the evidence at trial. He

simply concluded in his own mind that petitioner was guilty and that the sentence which he imposed was the appropriate sentence for the crime of which petitioner was found guilty by a jury.

The motion of petitioner is denied.