**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Herbert L. HEDGEMAN,
Defendant-Appellant.**

**No. 77–1184.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 12, 1977.

Decided Nov. 2, 1977.

Rehearing and Rehearing En Banc
Denied Dec. 20, 1977.

James D. Montgomery, Chicago, Ill., for defendant-appellant.

Thomas P. Sullivan, U. S. Atty., Richard C. Leng, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, and PELL and SPRECHER, Circuit Judges.

PELL, Circuit Judge.

This is an appeal from the denial of appellant Hedgeman's motion for a new trial pursuant to Rule 33, F.R.Crim.P., based upon newly discovered evidence. Hedgeman had been tried on sixteen counts: one count of conspiracy (18 U.S.C. § 286), seven counts of false claims (18 U.S.C. § 287), four courts of false statements (18 U.S.C. § 1010), and four counts of aiding and abetting false statements (18 U.S.C. §§ 1010 and 2(a)). He was acquitted on two of the substantive counts and was convicted on

three counts of § 287, four counts of § 1010, and four counts of §§ 1010 and 2(a). The conspiracy count resulted in a mistrial and the Government dismissed two substantive counts during the course of the trial. Ultimately this court affirmed the convictions as well as affirming the district court's denial of an alternative motion to vacate sentence or grant a new trial, which motion included a *Brady* issue.[1]

The present appeal also in essence claims a *Brady* violation with principal reliance upon the subsequent *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), upon which the Government also relies. Upon first blush, it might appear that the claim had arguable merit; however, from our further examination we are convinced that the prosecutorial suppression contention structured essentially on inference and considerable conjecture aided by hindsight fails to present a proper case for our remanding for a new trial.

The charges against Hedgeman grew out of the performance of his duties as an Area Management Broker for the Federal Housing Administration. Among his duties he was supposed to solicit bids, to make contracts, and to process claims for services in connection with rehabilitation of properties which had been acquired by foreclosure of insured mortgages. Testimony clearly demonstrated that Hedgeman had signed and passed on claims for work that was not performed; that he passed on bids in the names of persons who were not bona fide contractors; and that he filled out and passed on bids that otherwise were not bona fide bids. Proof on one of the counts on which Hedgeman was convicted, Count 17, demonstrated that his original inspection of the property revealed that no garage existed at the site, yet he certified that all repair specifications were met, including the painting of the non-existent garage.

The present appeal centers on the testimony of Pearson, a contractor, who testified that he had regularly paid kickbacks to Hedgeman on contracts that he had received. To support his testimony, the Government introduced through him nine of his work sheets on his contracts, each of which had notations which he said were made at the pertinent times and represented his records of how much he had paid Hedgeman. Pearson, an unindicted co-conspirator, was pursued diligently via the impeachment route and the information thus developed was utilized in oral argument to the jury. It was brought out that he had engaged in illegal acts such as destroying records to impede an IRS investigation and using fictitious names on bids. It was developed that Pearson had agreed at a meeting with Government attorneys while the present trial was in progress to give testimony and that he would not be prosecuted. With regard to the documents in question, the defense counsel examined Pearson on each count, pointing out differences in the color of the ink and possible alterations of the figures. The Government, in our opinion, fairly appraises the tenor of the extensive cross-examination relating to the payment notations as raising the inference that Pearson had recently fabricated these notations. At the meeting at which he had agreed to testify, Pearson brought the exhibits which had been in his possession prior thereto. Before bringing them to the Government, according to Pearson's testimony, he had not had any examinations or tests made of them to determine the age of the writing nor to his knowledge had the Government done so.

The focus now turns to one Purtell, an expert document examiner. Pearson's cross-examination occurred on January 23, 1974. Sometime that day defense counsel called Purtell and was told by him that age of ink determinations could not be made of writings done in ballpoint or fibrepoint pens. As a result of this conversation defense counsel apparently concluded that it was futile to bring the documents over to Purtell for examination. The following day Government counsel asked Purtell to meet with them after the conclusion of the day's trial. When he did so, Government counsel learned from him that he had talked to

1. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

defense counsel the previous day but that he had not been retained.

Purtell then examined one of the documents, making both a visual and microscopic examination. He then asked counsel if any other document examiner had looked at the document. Counsel replied in the negative and the question was twice more repeated and twice more denied. Purtell pointed out three spots on the document being examined which he said were the result of "tests for ink" made by a solvent. In response to a question from Government counsel, Purtell said the spots could not have been made by coffee because they were exactly on a line of writing. In his deposition, Purtell said he didn't exactly say that he was convinced that some expert or analyst had previously examined the document but he thought he "made inferences that when somebody was testing the ink, it had to be a document examiner." He specifically denied saying to Government counsel that the spots on the writing were "to determine the age of the writing," and said he was unable to tell whether the test he concluded had been made was to determine the age or the make of ink. He could not go beyond saying that the examiner was "making some determination in regards to the ink."

The specific original document on which the three spots were found by Purtell has never been identified and brought to the attention of this court on appeal. The appendix filed by Hedgeman contains a copy of his motion for new trial to which are attached copies of the exhibits introduced during Pearson's testimony as showing a notation of payment to Hedgeman. There is no indication as to which of the attached copies of exhibits, if any, was the one looked at by Purtell. Each of the exhibits, however, has substantial writing on it in addition to the payment notation. We have no way of being sure that the spots Purtell observed were on the payment notations or elsewhere; but it does appear because there was only one payment notation and the one document examined had three "solvent" spots, two on one side and one on the reverse, that other writing than the Hedge-

man payment notation was involved in at least two of the three spots. Finally, we note that when the respective counsel took the deposition of Purtell on September 22, 1976, there was a cursory effort to examine the exhibits but there was no follow through by the defense counsel to locate and identify the specific exhibit or document which Purtell had observed as having the three spots on it.

The Government counsel, according to his affidavit, after learning that it was not possible to ascertain from an examination the age of the questioned writing, and that defense counsel had already been told the same thing, did not consider the remaining conversation with Purtell other than incidental and did not make a mental connection with Pearson's testimony of the previous day that he had not had the documents examined. Government counsel, in any event, did not advise defense counsel of Purtell's remarks about a previous examination. The Government did not call Purtell as a witness. The trial was not concluded until the middle of February, and although the exhibits were available to defense counsel, no effort to subject them to examination was made by that counsel. Some two and a half years later, defense counsel happened to meet Purtell at a restaurant and when asked if he knew him responded, "Oh, yes, I know Dave. I asked him a question in regards to the age of ink and he gave me the answer once." Purtell responded, "That's quite interesting because the next day I was retained by the Federal District Attorney's Office to look at a document for the age of ink, and it was the same one you had talked about." For some reason this conversation, which is set forth in full, triggered a follow-up by defense counsel with the ultimate development of what is now claimed to be newly discovered evidence justifying a new trial.

The essence of the claim is that without Pearson's testimony there would have been no motivation for Hedgeman to have done the things he did, or failed to do; that he was handling the paper work in the manner he had been told to by government officials;

that he was acting in good faith (the jury had been instructed that good faith was a complete defense); that while Pearson's testimony was primarily directed to the conspiracy count, as to which there was a mistrial, the fact that the jury may have believed nevertheless that Hedgeman had accepted payoffs would cause the jury to discredit his testimony supporting his good faith defense; and that when the jury became aware of the fact that Pearson had committed perjury in saying that he had not had the document examined the members would conclude that he had lied about Hedgeman's accepting kickbacks and had fabricated the Hedgeman payment notations which would thereby eliminate any motivation for his falsifying the various documents and would ultimately make his claim of good faith credible.

The district court, on the basis of the deposition and documentary evidence submitted to it, after noting that the Government had admitted its knowledge of the defendant's newly discovered evidence, and assuming that this evidence would impeach (if not perjure) Pearson, and further assuming that the evidence was deliberately withheld, stated that it would have to set aside the conviction "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury," citing *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Noting that the newly discovered evidence related primarily to the conspiracy charge as to which the defendant had not been convicted, the district court found that there was no reasonable likelihood that the testimony of Pearson, if false, could have affected the judgment of the jury.

█ Putting aside for the moment the correctness of the district court making the assumptions it did, we, indulging in the same assumptions, nevertheless believe that the district court was correct in its finding. *See United States v. Johnson*, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562 (1946). Pearson was substantially impeached. The mistrial on the conspiracy charge to which his testimony was principally directed demonstrates the effectiveness of the impeachment. The additional testimony that solvent had been dropped on three lines of one exhibit while it was in the possession of Pearson, even if it led inexorably to the conclusion that he had the item examined by an expert in the subject to determine whether the age of the ink could be stated, although we have some considerable doubt as to the inexorability of the conclusion, could only have added to the impeachment evidence which the jury did hear, and which, based upon its failure to reach a verdict on the conspiracy verdict, the jury apparently found to be impeaching of Pearson's credibility. Of greater significance, however, is the fact that even if the jury had been convinced that Pearson had perjured himself when he testified that he had not had the document examined, we are unable to believe that the jury could have failed to convict upon the substantive counts in view of the very substantial proof of the specific charges contained in those counts on which Hedgeman was convicted. The defendant argues that without the jury believing that he was taking kickbacks, his testimony would have had greater credibility. This approach pays scant homage to the common sense of the average jury to say that the members would think that a person was acting in good faith when he certified completion of work that had not been performed, passed on bids in the names of persons who were not contractors, and certified a bill for work on a non-existent building. Further, even if Hedgeman had not received kickbacks, the question of motivation would not have been removed from the scene. Hedgeman was not working as a broker on a volunteer basis and it would seem to need no proof of human behaviorism that a person who can be compensated without having to provide the consideration of doing the work for which the compensation was intended has motivation to continue the process.

█ While, as we have previously indicated, we are of the opinion that the district court reached the correct result for the correct reason, there are other factors in the present case which we feel are worthy

of observation and which also cause us to think that the defendant was not unconstitutionally deprived of a fair trial. In treating the basis for the district court's finding, we entertained the same assumptions which that court did although implicitly expressing some doubt as to the propriety of those assumptions. The district court assumed that the evidence would be impeaching if not showing perjury. Yet the jury in so concluding would have had to determine that the evidence of three faint marks on one document, characterized as having been made by a solvent in the hands of an expert document examiner, raised the clear inference that Pearson, despite his denial under oath, had in fact had an examiner make some type of examination of the document while it was in his exclusive possession. Further, Pearson's testimony which the defendant claimed was perjured, or at the very least impeached, was that he had not had any examinations or tests made to determine *the age* of the writing. Purtell, however, did not claim that the tests were made to determine the age of the ink, and, indeed, expressed the opinion that the age of ballpoint or fibrepoint inks could not be so determined. Further, the district court assumed for the purpose of its ruling that the evidence was deliberately withheld. We recognize in the *Brady* perjury case it is not necessary that there be an intentional withholding if the prosecutor should have known of the perjury. *Agurs, supra* at 103. However, as we have already indicated it does not appear to us that a perjury situation has been demonstrated by the defendant.

In considering the evidence as non-perjurious and its materiality because it was not in fact communicated to the defense, we must again look at the context in which it occurred. The question placed to Pearson as to whether he had had the documents examined to determine the age of the ink was a single question coming at the end of an extensive cross-examination by Hedgeman's counsel. (Page 2406 of the Transcript.) On the next day, after the completion of the day's trial in a conference with Purtell, Government counsel learned that it

was not possible in the opinion of the expert to state the age of the ink. This negative answer to the very purpose for which the Government had requested the examination to be made logically followed the extensive cross-examination of the previous day attempting to suggest a subsequent fabrication by Pearson of the payment negotiations. Because Government counsel knew at that time that defense counsel had also learned from Purtell that no test was available to determine the age of the ink, it is scarcely surprising that the reference to some analyst having made an examination of a particular document would not be equated with an incidental single question occurring during the previous day. The information imparted gratuitously by Purtell, in what appears to us from a reading of the deposition to have been an unfriendly atmosphere, did not pertain to some exculpatory matter bearing upon the innocence of the defendant but at most was applicable to an exhibit in evidence and then only reflected that someone at some undisclosed time had made a test which served no purpose.

In this context, we find the words of Mr. Justice Stevens in *Agurs, supra* 427 U.S. at 108–09, 96 S.Ct. at 2399–2400, particularly applicable:

> The Court of Appeals [here the appellant] appears to have assumed that the prosecutor has a constitutional obligation to disclose *any information* that *might* affect the jury's verdict. That statement of a constitutional standard of materiality approaches the "sporting theory of justice" which the Court expressly rejected in *Brady.* For a jury's appraisal of a case "might" be affected by an improper or trivial consideration as well as by evidence giving rise to a legitimate doubt on the issue of guilt. If *everything* that *might* influence a jury must be disclosed, the only way a prosecutor could discharge his constitutional duty would be to allow complete [and in the present context continuing] discovery of his files as a matter of routine practice.

Whether or nor procedural rules authorizing such broad discovery might be desirable, the Constitution surely does not demand that much. While expressing the opinion that representatives of the State may not "suppress substantial material evidence," former Chief Justice Traynor of the California Supreme Court has pointed out that "they are under no duty to report sua sponte to the defendant all that they learn about the case and about their witnesses." [Emphasis added. Footnote and citation omitted.]

While the rigidity of procedural formalism and obeisance to arbitrary rules have to a large extent given way in modern jurisprudence to an approach sounding in the substance of the merits, nevertheless we cannot be completely unmindful that the posture of the present case is that of a motion for new trial based upon newly discovered evidence. The six points which a party seeking to prevail on such a motion must prove have been long established. *United States v. Curran*, 465 F.2d 260, 264 (7th Cir. 1972).[2]

An examination of the present appeal solely in the light of these six points would quickly result in an affirmance here, however, it now seems clear that when the new evidence raises issues which challenge the constitutional validity of the conviction the six points are of substantially diminished importance.[3] Thus, we note in *Agurs, supra* 427 U.S. at 111, 96 S.Ct. 2392, the Court stated that in the situation of prosecutorial suppression of the evidence as opposed to discovery from a neutral source, the defendant should not have to satisfy the burden of demonstrating that newly discovered evidence probably would have resulted in acquittal. Likewise the Government in the present case concedes that there is some

question as to the continued validity where a constitutional issue is involved of the requirement that the newly discovered evidence is not merely cumulative or impeaching. Indeed, the District of Columbia Circuit has expressed the view of the inapplicability in the constitutional issue context of the due diligence standard. *Marshall v. United States*, 141 U.S.App.D.C. 1, 5 & n.11, 436 F.2d 155, 159 & n.11 (1970).

■ While we do not necessarily disagree with the D. C. Circuit's statement as a general principle, we do not think in application that it should be carried to the extreme that we find ourselves as arbiters in a case exemplifying *Brady*'s "sporting theory of justice." We are of the opinion that at the very least the evidence must be newly discovered, and in this respect it appears to us that failure to exercise diligence can be so obviously bordering on gamesmanship as to place the evidence constructively in the category of non-newly discovered. Thus in *United States v. Iannelli*, 528 F.2d 1290, 1293 (3d Cir. 1976), the court held that the "newly discovered evidence" was in fact not newly discovered because the forgery of initials on an authorization for an electronic surveillance, if, in fact, they were forged, could have been discovered at the time of the trial by subjecting the initials to expert handwriting analysis. *Iannelli* did not explicitly treat the *Brady* issue although presumably the Government was aware of whether the initials were those of the person they purported to be and did not communicate this information to the defendant. In *United States v. Bermudez*, 526 F.2d 89, 100 (2d Cir. 1975), *cert. denied*, 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976), the defendant in his Rule 33 motion based on newly discovered evidence did raise a *Brady*

**2.** 1st. That the evidence has come to his knowledge since the trial. 2d. That it was not owing to want of due diligence that it did not come sooner. 3d. That it is so material that it would probably produce a different verdict, if the new trial were granted. 4th. That it is not cumulative only—viz.:—speaking to facts, in relation which there was evidence on the trial. 5th. That the affidavit of the witness himself should be produced, or its absence accounted

for. And 6th, a new trial will not be granted, if the only object of the testimony is to impeach the character or credit of a witness.

**3.** We do not need at this time to determine the extent to which the movant for a new trial on the basis of newly discovered evidence and who asserts a constitutional violation is to be treated for all purposes as though he were a petitioner under 28 U.S.C. § 2255.

issue because of the failure of the Government to disclose state investigative files it had which reflected that state narcotics agents had cooperated with federal agents in an investigation. The court rejected the contention on a due diligence basis because defense counsel was aware of pending state court proceedings and was in a position to subpoena state files. While *Bermudez* was pre-*Agurs*,[4] we are mindful that in *Agurs, supra,* 427 U.S. at 108, 96 S.Ct. 2392, the Court laid down as an underlying principle that the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial.

We have considerable difficulty in saying that Hedgeman was denied a fair trial in a situation in which his counsel attacked vigorously through cross-examination Pearson's testimony that he had in fact made the payment notations at or near the same time that the documents were prepared and not at some later time, in which the defense had the opportunity to have the documents examined by an expert, in which defense counsel talked to an expert, and in which he did not even make the effort to follow through with an examination which if performed by a skilled examiner might have reflected some other aspect bearing upon the time of any particular writing, as it is now claimed that the Government examination did in fact do, even if the age of the ink was not subject to revealing analysis. Indeed, that follow through has not occurred even yet. When a fortuitous conversation which happened two and half years after the trial brings to light an evidentiary matter which would have been developed if the available examination had been caused to be made, as it readily could have been, at the time of the trial, we find little persuasive reason to say that the trial was unfair. Ingeniously developed evidence by hindsight should not be permitted to be substituted for that which was readily subject to development at the trial.

For the reasons herein set forth the judgment of the district court is

AFFIRMED.

4. While it is well established that denial of a petition for certiorari carries with it no approval of the decision which the Court has declined to review, it is interesting to note that in *Ber-mudez* the petition for certiorari was denied on May 19, 1976, and *Agurs*, which was argued April 28, 1976, was decided on June 24, 1976.