UNITED STATES of America,
Plaintiff-Appellee,

v.

Stanley B. ROBINSON,
Defendant-Appellant.

Stanley B. ROBINSON,
Petitioner-Appellant,

v.

UNITED STATES of America,
Respondent-Appellee.

Nos. 77–1097, 77–1098.

United States Court of Appeals,
Seventh Circuit.

En Banc Rehearing April 14, 1978.

Decided Oct. 6, 1978.

Rehearing Denied Jan. 11, 1979.

Ann C. Tighe and Robert M. Stephenson, Asst. U. S. Attys., Chicago, Ill., for United States.

Willard J. Lassers, Chicago, Ill., for Robinson.

Before FAIRCHILD, Chief Judge, and SWYGERT, CUMMINGS, PELL, SPRECHER,* TONE,* BAUER and WOOD, Circuit Judges.

SWYGERT, Circuit Judge.

The issues presented on appeal arise out of the district court's denial of Robinson's Rule 33 motion for a new trial based on the ground of newly discovered evidence and his petition under 28 U.S.C. § 2255 for relief from sentence.[1] Robinson's section 2255 petition was based on the same newly discovered evidence and also alleged Government suppression of documents relevant to his defense in violation of 18 U.S.C. § 3500 and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Alternatively, Robinson disputes the propriety of the district court's dismissal of the motion and petition without holding an evidentiary hearing.

* Circuit Judges Sprecher and Tone did not participate in the consideration of the en banc rehearing.

I

In August 1973, Stanley B. Robinson was convicted after a jury trial of conspiracy, violation of civil rights, and kidnapping resulting in murder, in violation of 18 U.S.C. §§ 241, 242, and 1201(a), and sentenced to three concurrent terms of life imprisonment and an additional concurrent term of one year. Because the essential facts are comprehensively set forth in our prior decision affirming the convictions, *United States v. Robinson*, 503 F.2d 208 (7th Cir. 1974), *cert. denied*, 420 U.S. 949, 95 S.Ct. 1333, 43 L.Ed.2d 427 (1975), it is necessary only to summarize those portions of the testimony pertinent to this appeal.

William O'Neal, Jr., a paid Government informer, testified that he and Robinson kidnapped Jeff Beard and drove him to Indiana where Robinson shot and killed Beard with a .45 caliber Colt automatic pistol. Robinson then gave O'Neal, Jr. the gun which was covered with mud, soil, and hair as a result of the struggle between Robinson and Beard immediately preceding the killing. O'Neal, Jr. stated that after receiving the weapon, he gave it to his father.

William O'Neal, Sr. testified that because the gun was full of mud, he soaked it in a pan of salt water for twenty-four hours and thereafter disassembled it and cleaned the barrel with a clothes hanger and a cloth. According to O'Neal, Sr., he attached the cloth to the end of the hanger and proceeded to "saw up and down" the barrel, using machine oil as a lubricant. The cloth occasionally slipped off the hanger and might have caused the hanger to rub against the core of the barrel.

Following O'Neal, Sr.'s testimony, a Government firearms expert, Robert Frazier, testified that the fatal bullet was fired from a weapon which had the same general rifling characteristics as the .45 pistol he

1. Robinson also asserted other claims in his section 2255 petition that are not argued on appeal.

examined. Frazier further testified, however, that he had compared the fatal bullet with test firings from the .45 and determined that a conclusive identification could not be made because of differences in the microscopic markings inscribed on the bullets by the barrel core upon firing. Frazier indicated that various ways of handling the weapon could have caused changes in the microscopic markings on the barrel core between the time the bullet that killed Beard was fired and the time the gun was examined, and that such changes could explain his inability to make a positive identification of the .45 as the murder weapon. In response to a hypothetical question, Frazier stated that the cleaning procedure described by O'Neal, Sr. could have altered the markings on the inside of the barrel and therefore could explain the failure to make a conclusive connection. Frazier was not asked whether his examinations had disclosed that O'Neal, Sr. had in fact treated the weapon as he had testified.

Robinson denied involvement in the Beard killing. He testified that the .45 pistol used to kill Beard had been stolen from him, and frequently implied that O'Neal, Jr. had used the weapon to kill Beard.

On January 28, 1974, six months after trial and while the initial appeal was pending, Robinson made his first request for a scientific examination of the gun to determine whether it actually had been soaked and reamed as described by O'Neal, Sr. and whether the gun had fired the bullet that killed Beard. The Government refused this request. After his conviction was affirmed on appeal,[2] Robinson moved for such examination. The district court granted the motion on October 24, 1975.

The reports from the microscopic and microprobe analyses conducted by three experts on the .45 pistol, the fatal bullet, and the four test bullets fired by the FBI were submitted to the district court with Robinson's motion for a new trial and section 2255 petition. One expert, James Dahn, concluded "to a reasonable degree of scientific certainty" that the weapon had not been soaked in salt water and was not reamed with a clothes hanger. Additionally, Dahn was convinced that "the .45 calibre Colt automatic pistol did not fire the bullet recovered from the body of Jeff Beard. . . . ." A second expert, Professor Joseph D. Nicol, concurred with Dahn's finding that there was no evidence that the cleaning procedures described by O'Neal, Sr. had been performed on the weapon. Nicol concluded, however, that it remained possible that the weapon in evidence had fired the fatal bullet. In response the Government filed an affidavit by its expert Frazier, based on his previous examination, which generally accounted for the failure of Robinson's experts to link the gun and the bullet.

## II

Robinson contends that he should have been granted a new trial because the results of the examinations of the gun established that O'Neal, Sr. committed perjury when he testified that he cleaned the gun in the manner described. Robinson asserts that since the jury might have reached a different conclusion if it had known that O'Neal, Sr.'s testimony was false, he is entitled to a new trial under *Larrison v. United States*, 24 F.2d 82 (7th Cir. 1928).[3] Alternatively, Robinson contends that even if the affidavits supporting his motion and section 2255 petition do not conclusively prove that O'Neal, Sr. committed perjury, they still

---

2. *United States v. Robinson*, 503 F.2d 208 (7th Cir. 1974), *cert. denied*, 420 U.S. 949, 95 S.Ct. 1333, 43 L.Ed.2d 427 (1975).

3. *Larrison* requires the granting of a new trial when:

 (a) The court is reasonably well satisfied that the testimony given by a material witness is false.

 (b) That without it the jury *might* have reached a different conclusion.

 (c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

*Id.* at 87–88 (emphasis in original).

present newly discovered evidence which necessitates a new trial under the test set forth in *Berry v. Georgia*, 10 Ga. 511 (1851),[4] or under 28 U.S.C. § 2255.[5]

The district court denied Robinson's motion finding that Robinson had not satisfied the *Larrison* test because he had failed to prove O'Neal, Sr. had testified falsely. The court then held that Robinson's failure to have the gun examined prior to or during trial showed a lack of due diligence resulting in the defeat of his *Berry* claim. Apparently on the basis of the same reasoning, the court denied that part of Robinson's section 2255 petition based upon new evidence.

Subsequent to oral argument in this court, but prior to the decision by the original panel, both parties were allowed to supplement the record. The Government produced an FBI laboratory report dated June 14, 1972. Robinson stipulated that he had received a copy of this report on March 15, 1973, seven weeks before the opening of the trial on June 5.[6] The report stated that a conclusion could not be reached as to whether the fatal bullet had been fired from the .45 weapon, "possibly due to changes in the barrel of this pistol due to cleaning procedures." The Government offered this document to establish that Robinson had received notice of the cleaning issue before trial and therefore the district court's finding that Robinson's lack of diligence prevented the new evidence from being heard at trial was correct.

Among other documents, Robinson introduced an FBI report of an interview with O'Neal, Sr., dated October 13, 1972. According to this report, O'Neal, Sr. had originally informed FBI agents that he "disassembled the weapon and boiled it in water to clean it." Robinson contends that this report contradicts O'Neal, Sr.'s trial testimony as to the cleaning procedure and therefore supports the allegation that O'Neal, Sr. committed perjury. Robinson argues that even if we do not find that the district court erred in its original findings, we must remand to the district court for a reconsideration of its decision on the perjury issue under *Larrison* in light of this conflicting evidence.[7]

At the outset we note that although the district court based its rejection of the application of the *Larrison* standard on a finding that Robinson failed to establish O'Neal, Sr.'s perjury, we need not address that finding here. It is fundamental that a defendant seeking a new trial under either the *Berry* or *Larrison* rule must establish that the material asserted to be newly discovered could not have been discovered with due diligence before or during trial. *United States v. Costello*, 255 F.2d 876, 879 (2d Cir.), *cert. denied*, 375 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958). As Judge Dimock concluded in *United States v. Flynn*, 131 F.Supp. 742, 743 (S.D.N.Y.1955), "[r]equirement (c) of the Larrison rule, like

---

**4.** The *Berry* test is used to consider a motion for a new trial under Fed.R.Crim.P. 33 where the newly discovered evidence submitted is other than perjured testimony. Under *Berry*, a new trial will be granted when it is established that (1) the evidence came to defendant's knowledge since the trial; (2) the evidence could not with due diligence have been discovered sooner; (3) the evidence is material; (4) the evidence would probably lead to an acquittal in the event of a retrial; and (5) the evidence is not merely impeaching or cumulative. *See also United States v. Johnson*, 142 F.2d 588 (7th Cir.), *appeal dismissed*, 323 U.S. 806, 65 S.Ct. 264, 89 L.Ed. 643 (1944).

**5.** As this court previously recognized:
Relief is available under § 2255 only if the petitioner demonstrates that the error of the trial court is jurisdictional or constitutional,

or an error of law which is "a fundamental defect which inherently results in a complete miscarriage of justice" and which presents "exceptional circumstances where the need for the remedy afforded by the writ of *habeas corpus* is apparent." [*Davis v. United States*, 417 U.S. 333, 346, 94 S.Ct. 2298, 2305, 41 L.Ed.2d 109 (1974).]
*Gates v. United States*, 515 F.2d 73, 76–77 (7th Cir. 1973).

**6.** Robinson referred to this report as dated June 24, 1972. The record, however, clearly discloses that both parties are referring to the identical document.

**7.** The Government's alleged failure to produce this document in time for consideration by the district court is discussed in Section III.

so many of the other rules of our law, requires due diligence of him who invokes it." *See also United States v. Becker*, 466 F.2d 886 (7th Cir. 1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 910, 34 L.Ed.2d 689 (1973). It is only necessary, therefore, to determine whether the district court's denial of Robinson's motion for a new trial on the basis of a lack of due diligence was "wholly unsupported by evidence." *United States v. Johnson*, 327 U.S. 106, 111, 66 S.Ct. 464, 90 L.Ed. 562 (1946).

The record established that the .45 pistol was available to Robinson in advance of trial. At that time he could have conducted any examination he deemed necessary. Robinson, however, asserts that the Government was guilty of deceit by stipulating that a match could not be made between the fatal bullet and the .45 without revealing O'Neal, Sr.'s cleaning story. We find such assertion to be without merit. The Government at no time stated that the .45 was not the murder weapon. The FBI report of June 14, 1972, should have put Robinson on notice as early as seven weeks before trial that there could be a cleaning issue upon which the Government might rely in explanation of the failure to make a conclusive match. Robinson, however, failed to act on such report.

In addition, O'Neal, Sr. testified approximately thirty days before the trial closed. Yet Robinson made no request for a continuance to examine the gun either at the time of the testimony or during the remainder of the trial. It was not until six months after trial that Robinson first requested that the Government allow such an examination. Robinson did not make a formal motion to

the court until one year after the Government denied the initial request. We think that this is a clear case where "[i]ngeniously developed evidence by hindsight should not be permitted to be substituted for that which was readily subject to development at the trial." *United States v. Hedgeman*, 564 F.2d 763, 769 (7th Cir. 1977). *See also United States v. Cook*, 432 F.2d 1093, 1101–2 (7th Cir. 1970), *cert. denied*, 401 U.S. 996, 91 S.Ct. 1224, 28 L.Ed.2d 535 (1971).

■ Regardless of whether Robinson purposefully chose not to examine the .45 pistol sooner as part of his defense strategy [8] or merely failed to do so, we agree with the district court that the results of such examination could have been discovered before or at trial with due diligence. We, therefore, find no abuse of discretion in the district court's denial of Robinson's motion for a new trial and a remand for reconsideration of the perjury issue would serve no useful purpose.

■ That part of Robinson's section 2255 petition based on newly discovered evidence would also fail under a similar due diligence analysis. See *Franklin v. United States*, 428 F.Supp. 1184, 1187 (E.D.Okl. 1977). In addition, where perjury is an issue under section 2255, a defendant must show that a prosecutor knew or should have known a witness' answers were false in order to merit a new trial. *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *see also Teague v. United States*, 499 F.2d 1381 (7th Cir. 1974). Even assuming *arguendo* that O'Neal, Sr. had committed perjury, Robinson made no claim that the Government knew or should have known that he had done so.[9]

---

**8.** At trial Robinson implied that O'Neal, Jr. had stolen the .45 from him and used it to kill Beard. On appeal, Robinson asserted that the Government permitted the destruction of potentially exonerating evidence by not obtaining the weapon from O'Neal, Sr. for five days and thereby allowing the pistol to be cleaned. Finding that Robinson had waived such issue, this court stated:

> Robinson could have consistently argued both that the .45 was not the murder weapon and that he did not possess it. However, the Government's position is given much

strength by the fact that Robinson did not raise the destruction of evidence issue in the trial court. This suggests that he was willing to concede the identification of the .45 as the murder weapon.

*United States v. Robinson*, 503 F.2d at 214.

**9.** Although Robinson implied that the Government had been negligent by not attempting to verify O'Neal, Sr.'s story, he made no explicit assertion in' his section 2255 petition that the Government knew or should have known of O'Neal Sr.'s alleged perjury. Even after he supplemented the record with the report of

■ Where a record conclusively demonstrates that a defendant is entitled to no relief on his section 2255 petition to vacate sentence, a full evidentiary hearing is not required. *See Machibroda v. United States*, 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962). Robinson's lack of due diligence and failure to claim that the Government had reason to know of any alleged perjury necessarily defeats his section 2255 petition. We hold, therefore, that the district court's summary dismissal of Robinson's motion and section 2255 petition for a new trial on the grounds of newly discovered evidence was appropriate.

## III

Robinson's second claim for a new trial in his section 2255 petition is that the Government withheld information relevant to his defense in violation of the Jencks Act, 18 U.S.C. § 3500, and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This claim particularly focuses on certain materials produced by the Government in a case involving the Black Panthers, *Hampton v. Hanrahan*, No. 70 C 1384 (N.D.Ill. April 15, 1977), in which William O'Neal, Jr. was a defendant. At that trial, the Government produced sixteen bound volumes containing over 10,000 pages of documents from the FBI file on O'Neal, Jr. covering the period 1968–1974. Robinson alleges that since O'Neal, Jr. terminated his affiliation with the Black Panthers in or around 1970 and many of the documents cover the April-May 1972 period involved in this case, there necessarily must be section 3500 or *Brady* material contained therein. Furthermore, according to Robinson, trial testimony by both O'Neal, Jr. and his FBI contact, Agent Roy Mitchell, that the two were in daily contact during this period and that Mitchell took notes at such meetings, fortifies his assertion that section 3500 materials in the *Hampton* documents were withheld.

The district court rejected Robinson's claim, finding that he had furnished no basis for his assertion that anything within these materials was relevant to his case. The court concluded that Robinson's claim that the Government must have withheld some section 3500 materials was "mere speculation."

On appeal Robinson contends that the district court erred in making a finding that the *Hampton* documents were irrelevant without first making an *in camera* inspection. Robinson argues that since the documents are chronologically arranged and categorized by topic, such inspection would not present a prohibitively onerous burden on the court. Robinson also alleges that the report of the October 13, 1972, interview between the FBI and O'Neal, Sr. with which he supplemented the record, was not provided to him at trial and thus is an additional violation of both section 3500 and *Brady*. The Government, however, disputes such allegation, claiming that the report was provided with other section 3500 materials.

■ To review the propriety of the district court's refusal to order the *Hampton* documents turned over to Robinson or be inspected by the court *in camera* under the Jencks Act, we must first consider the purposes the Act is meant to serve. The Act attempts to balance the Government's interest in limiting and regulating defense access to Government files against a defendant's "entitle[ment] to relevant and competent reports and statements in possession of the Government touching the events and activities as to which a Government witness has testified at the trial . . . ." S.Rep.No. 981, 85th Cong., 1st Sess. 3, *reprinted in* [1957] U.S.Code Cong. & Admin. News, p. 1862. In order to achieve both these goals, the Act requires that a defendant first meet the burden of specifying with reasonable particularity (normally by his cross-examination at trial) that a certain

O'Neal, Sr.'s October, 1972 statement to the FBI, Robinson failed to charge the Government with such knowledge, stating only that the difference between O'Neal, Sr.'s two cleaning stories should have made the Government "suspicious" of perjury. This is insufficient to raise the issue.

document exists, that there is a reason to believe that the document is a statutory "statement," and that the Government failed to provide it in violation of the Act. *Goldberg v. United States*, 425 U.S. 94, 116, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976) (Powell, J., concurring). Upon such showing, a court must then conduct an *in camera* inspection to determine whether the document is both relevant and a competent "statement" under the Act.

 A review of the record shows that Robinson failed to carry his initial burden of defining with particularity a specific document which the Government failed to produce and therefore the court did not need to conduct an *in camera* inspection. During cross-examination, O'Neal, Jr. testified that he had seen a typed version of his answers to the questions posed by Mitchell during their meetings in the form of either a summary or a transcript. The Government had turned over such a summary dated May 1, 1972, as section 3500 materials. There is simply no indication of the existence of any other section 3500 material documenting conversations between Mitchell and O'Neal, Jr.[10] Speculation as to the existence of other documents is not sufficient to require an *in camera* investigation.

 Robinson's *Brady* claim in regard to the *Hampton* documents fails under the same analysis. It is simply impossible for a court to rule on an alleged *Brady* violation unless a defendant identifies with reasonable particularity the evidence to be considered. Furthermore, to allow the rummaging through Government files under the authority of *Brady* would be to defeat the stated legislative intent of the Jencks Act and therefore cannot be allowed.

 The report of the October 13, 1972 interview with O'Neal, Sr. was unquestiona-

bly material required to be provided to Robinson under section 3500. Although it has not been determined whether it was so produced, even assuming *arguendo* that Robinson did not receive it, such failure by the Government would not warrant a new trial in this case. The alleged discrepancy between O'Neal, Sr.'s description in the report that he "boiled" the gun and his later testimony at trial that he "soaked and reamed" the gun does not present an incongruity sufficient to raise the question of perjury. Since Robinson repeatedly attacked O'Neal, Sr.'s credibility during cross-examination at trial, use of the report for further impeachment purposes would have been merely cumulative. If the Government erred, therefore, by not furnishing Robinson the report as required by the Jencks Act, the error was harmless.

 Neither would the Government's error warrant a new trial under *Brady*. Only "if the omitted evidence creates a reasonable doubt that did not otherwise exist, [has] constitutional error . . . been committed. This means that the omission must be evaluated in the context of the entire record." *United States v. Agurs*, 427 U.S. at 112, 96 S.Ct. at 2402 (footnote omitted). Our examination of the record in light of the difference between the report and O'Neal, Sr.'s testimony establishes that the requisite reasonable doubt has not been created.

## IV

For the reasons stated above, we affirm the judgment of the district court.

HARLINGTON WOOD, Jr., Circuit Judge, with whom FAIRCHILD, Chief Judge, joins, dissenting.

I respectfully dissent from the majority opinion as I believe it is the district court,

---

10. Robinson made the claim for the first time at oral argument that since Mitchell had testified as a witness, any material in the documents written by him also constituted section 3500 material. This argument fails for two reasons. First, no specific documents were identified at trial. Second, "endorsement of this broad right would require either a wholesale turnover of FBI files to any defendant on

demand or, at a minimum, that the trial judge examine for relevance and materiality all of the reports filed by any government agent who took the witness stand. . . . [W]e decline appellant's invitation to adopt such a broad (and necessarily unilateral) discovery rule."
*United States v. Nickell*, 552 F.2d 684, 689 (6th Cir. 1977), *petition for cert. denied*, 436 U.S. 904, 98 S.Ct. 2233, 56 L.Ed.2d 402 (1978).

not this court, which should first inquire into and resolve the two issues of fact which were more fully developed by information produced during this appeal and therefore not completely submitted to the district court. This appeal was originally disposed of by an unpublished order, based on that premise. The panel consisted of Judges Fairchild, Swygert and Wood, with Judge Swygert dissenting. The Government sought and obtained rehearing *en banc.*

Of course, in reversing the denial of the new trial and Section 2255 motions and remanding them for further consideration, the original panel order by no means represented a conclusion that the district court should eventually set aside the conviction and grant a new trial, although the tone of the government's. petition might suggest that government counsel feared that would happen.

Since *en banc* consideration under Rule 35 of the Rules of Appellate Procedure is stated not to be favored and is reserved generally for questions of exceptional importance, one might reasonably except to be enlightened on some unusual or important issue. I recognize nothing in this case except a difference of opinion as to the application of recognized rules to the particular circumstances.

Robinson was convicted of kidnapping and killing Beard on the basis of the testimony of O'Neal, Jr., a paid government informant, who admittedly participated in the crime to some extent, but who claimed Robinson did the killing with the pistol in question. Robinson denied the killing and claimed the gun had been stolen from him. O'Neal, Jr. testified that after the killing, Robinson gave his pistol to O'Neal, Jr., who then took it to his father, O'Neal, Sr., O'Neal, Sr., said he cleaned it.

How O'Neal, Sr. cleaned the pistol remains a significant question in this rather bizarre case. The first issue involves his possible perjury in testifying about what he did to clean the pistol. O'Neal, Sr., has given two versions. His various explanations have an effect upon the possibility that the pistol might not be the murder weapon as it is claimed to be by O'Neal, Jr. That in turn reflects upon the credibility of this somewhat unsavory, but all important government witness.

After the trial was concluded, Robinson pursued government documentary evidence through the Freedom of Information Act and the Privacy Act and received through that means certain pertinent documents, at least some of which are claimed to have been previously unknown to him. Those documents which were allowed to become a supplement to the record while this appeal was pending included an FBI report of an interview with O'Neal, Sr., on October 13, 1972, in which O'Neal, Sr., was quoted as having explained only that he had boiled the pistol in water to clean it. Following the supplementing of the record, conflicting and inconclusive affidavits of opposing counsel were filed in this court as to whether or not the government previously had supplied that document to Robinson. O'Neal, Sr.'s earlier version of the cleaning in the October 13, 1972, interview report, which Robinson claims he was not furnished, becomes relevant when contrasted with O'Neal, Sr.'s later trial testimony. At trial O'Neal, Sr., testified that he had soaked the pistol in salt water for a full day and then attempted to ream out the barrel of the pistol with a coat hanger. He attached a cloth, he said, to the end of the coat hanger which he used to "saw up and down" inside the barrel. The cloth sometimes came off the hanger, he explained, and may have caused the wire hanger to rub against the inside of the barrel. It was this latter cleaning version which served at trial as an excuse for the government expert's inability to identify the pistol as the murder weapon because of the effect that that particular cleaning procedure could have upon the ballistics comparison. Robinson claims that not having been informed prior to trial of that explanation and its basis he had justifiably relied on the favorable pretrial information supplied by the government and a stipulation simply to the effect that the pistol and bullet could not be

matched. Robinson, therefore, claims that he was surprised and "trapped" at trial by O'Neal, Sr.'s later cleaning explanation which related directly to the pistol's identification. The government seeks to counter the allegation by pointing to a few lines in an FBI laboratory report dated June 14, 1976, which suggests that cleaning procedures may possibly have affected the ballistic analysis. Even that report, which the government claims Robinson did receive, however does not reveal O'Neal, Sr.'s two cleaning versions. As footnote six in the majority opinion suggests, there is even some confusion about the identity according to the date of this report. That June 14, 1972, report upon which the government and the majority now rely was not part of the record when this case was first heard by the original panel, but was only brought to this court's attention by the government through a supplement to the record three days before the *en banc* hearing. If the word "bizarre" may apply to the factual questions, it may also apply to the course of procedure in this appeal.

Even after Robinson's conviction had been affirmed on direct appeal the district court granted Robinson's motion to have a scientific examination made of the pistol to determine whether the alleged murder weapon fired the shot that killed the victim. The identification of the pistol therefore obviously continued to be considered by the district court as an important and questionable fact issue in the case. The subsequent reports of Robinson's experts found that there was no evidence that salt water and a coat hanger had in fact been used to clean the pistol. Nor could Robinson's experts say the fatal bullet had come from the pistol; one was positive it had not. If these expert opinions are considered credible when considered along with O'Neal, Sr.'s original cleaning explanation, there would remain in the record little explanation for the government's failure to prove the pistol was the murder weapon linked to Robinson. The district court without hearing originally denied Robinson's motion for a new trial

and his Section 2255 petition. It must be emphasized, however, that the district court did not at that time have before it the earlier cleaning explanation of O'Neal, Sr., which may be viewed as corresponding with the analysis of Robinson's experts.

Robinson was unquestionably entitled to O'Neal, Sr.'s October, 1972, interview report under the Jencks Act, possibly also under *Brady*, but we are in no position to determine from the conflicting affidavits of counsel whether or not the report was timely furnished, and if not, why not. If not furnished, it is the district court which should determine the report's possible impact, if any, on the trial. If not furnished, the explanation of why not might also deserve consideration when viewing the issue of Robinson's diligence.

Robinson's lack of diligence in bringing these matters to the district court's attention is a factor to be considered. However, I believe that in the particular circumstances of this case that issue together with the other questions viewed in the light of the circumstances now known to this court but not known to the district court deserve to be further considered and resolved by the district court. I would leave fact finding to the district court. Usually we do. *United States v. Disston*, 582 F.2d 1108, 1111–1112 (7th Cir. 1978); *United States v. Tanner*, 471 F.2d 128, 143 n.23 (7th Cir. 1972). In bringing cases to a final conclusion, diligence is a consideration but so is the satisfaction that the search for the truth has been pursued as far as may reasonably be possible.

The other issue concerns Robinson's allegation that the government failed to supply in Robinson's trial other Jencks Act or *Brady* documents relating to O'Neal, Jr., which may have come to light in the 1976–77 *Hampton*[1] trial. Some documents were generated by the FBI during the short overlapping time period of the two cases. Robinson at trial asked for the FBI's interviews with O'Neal during that overlapping time period, but excluded those relating only to the "Panthers." The government

---

1. *Hampton v. Hanrahan*, No. 77–1698, is now on appeal in this court, but undecided.

284

first argues that Robinson's request for the interviews should be interpreted as a failure to make any request, but it should not be so narrowly construed.

Next, the government argues that the documents in the *Hampton* case did not qualify as Jencks Act material as they did not relate to the subject matter of O'Neal, Jr.'s testimony; and further, that the documents could not be considered as qualifying as "statements of the witness." However, at the *en banc* oral argument one of the government's counsel proceeded to answer the government's own arguments by conceding that there were included in the *Hampton* files pertinent interview reports of O'Neal, Jr., which related to the present case. Counsel, however, then represented that in any event those documents had been supplied to Robinson.

There is, moreover, at least a challenge by *Hampton* plaintiffs to the government's good faith in completely producing O'Neal documents even so recently as the *Hampton* trial.

The government also argued that to require an *in camera* inspection of the *Hampton* documents would have unnecessarily imposed on the district court an "onerous burden." However, at the *en banc* oral argument one of the government counsel advised the court that she had reviewed the documents of the pertinent time period and that the review had not taken her very long.

At the *en banc* oral argument, government counsel further represented that there were nine O'Neal, Jr., interviews in the *Hampton* files during the time period. Robinson, however, in his brief has acknowledged receipt of only eight O'Neal, Jr., interview memoranda. I do not find in the record that the government has previously disputed that Robinson received only eight memoranda.

I believe it is the district court, not this court, which should also clear up this clouded issue which continued to develop during this appeal.

I would reverse and remand this case to the district court for further proceedings. By advocating the application to this case of the ordinary *Disston* and *Tanner* procedures for resolution by the district court of factual matters first arising on appeal, it is again emphasized that no implication is intended as to what result should be arrived at by the district court.